**ASSOCIATION FOR RETARDED CITI-
ZENS OF NORTH DAKOTA, et
al., Plaintiffs,**

v.

**Allen I. OLSON, Governor of the State
of North Dakota, et al., Defendants.**

Civ. No. A1–80–141.

United States District Court,
D. North Dakota,
Southwestern Division.

Aug. 31, 1982.

474

Michael J. Williams, Bismarck, N.D., Mary Deutsch Schneider, Legal Assistance of N.D., Fargo, N.D., for plaintiffs.

Robert O. Wefald, Atty. Gen., Rick D. Johnson, Daniel L. Hovland, Asst. Attys. Gen., Albert A. Wolf, Sp. Asst. Atty. Gen., Bismarck, N.D., for defendants.

## MEMORANDUM and ORDER

VAN SICKLE, District Judge.

## I. PROCEDURAL HISTORY

The Association for Retarded Citizens of North Dakota, a non-profit North Dakota corporation formed in 1957, and six mentally retarded citizens of North Dakota brought this class action seeking declaratory and injunctive relief regarding treatment and conditions in the Grafton and San Haven state facilities and alternatives to placement to those facilities. The defendants are public officials responsible for the care and condition of the mentally retarded citizens the plaintiffs represent.

This court granted plaintiffs authority to proceed with this action as a class action under Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure. The plaintiff class now consists of the Association for Retarded Citizens (A.R.C.) and all persons who, as of September 26, 1980, and at any time thereafter, have been or may become residents of the Grafton state school. The Grafton state school consists of two campuses, one located at Grafton, and the other, called San Haven, located at Dunseith.

Prior to the trial of this case, on November 4, 1981, the court issued a Decree and Order with consent of the parties. The court decreed that the plaintiffs who are residents of the Grafton State School have rights under the Fourteenth Amendment to the Constitution of the United States and Section 25–01.2–02 of the North Dakota Century Code including the right to minimally adequate treatment and care, and to have the defendants provide the least restrictive practicable alternatives to hospitalization. To enforce these rights the court ordered the defendants to limit the use of medications, to cease corporal punishment, neglect and abuse, to reduce the use of physical restraints, to institute proper feeding programs and fire standards, to conduct a skill and needs inventory on all residents, and to hire an additional 125 specified personnel.

On December 16, 1981, the court issued a second order finding that plaintiffs were prevailing parties, based on the defendants admission of liability and the defendants offer for judgment. Upon this finding, the court awarded to the plaintiffs $183,197.50 as interim attorneys' fees.

The defendants having failed to comply with the provisions of either order, on May 7, 1982, the Court ordered the defendants either to hire the additional 125 personnel specified in the November 4, 1981 order or to transfer all residents of Grafton and San Haven to hospitals or other facilities which are adequately staffed by September 1, 1982. In addition, the court declared that plaintiffs were entitled to interest on the fees and expenses previously awarded and repayment of interest paid to lending agencies for operational loans.

The trial of this lawsuit lasted 31 days, running from January 28, 1982 to May 14, 1982. During this time the court heard

extensive testimony of health professionals from all areas in the care and treatment of the mentally retarded. Following the trial, the parties submitted post-trial briefs to the court along with plans for the implementation of the court's proposed order.

## II. THE FACTS

The North Dakota Constitution as originally adopted in 1889 made no provision for a separate school for the "feeble-minded." In 1904 the Constitution was amended to provide:

> ". . . there shall be located at or near the city of Grafton, in the County of Walsh, an institution for the feebleminded, . . . ." [1]

In 1943 the San Haven facility, originally constructed as a tuberculosis sanatarium, was transferred into the Grafton state school.[2]

The history of treatment of retarded persons encompasses at least three distinct phases which are reflected in the statutory history of North Dakota law concerning the care and treatment of the retarded.[3] Originally the institutions for the retarded were considered as temporary special care facilities. They were often called "schools."

The decades before 1940 saw the development of permanent care facilities operated under the theory now referred to as "medical model." This theory held that retarded and malformed persons were not capable of self improvement; so society could only care for them in a humane manner throughout their lives. During this period, laws of the various states dealt with "sterilization of the congenitally feebleminded" and distinguished the "trainable" as against the "educable." In the aftermath of World War II, and initially in the French military hospitals, the use of psychotropic (conduct controlling) drugs was developed and expanded. States began to use these drugs in the care of the mentally retarded. This development fitted into the "medical model" under which the schools for the retarded were being administered. The states did what they could, medically, to alleviate the suffering of retarded and malformed children, and to protect against their propagation. And having done that, the states provided the retarded with custodial care for the duration of their lives.

In the last three decades, behavioral scientists have developed techniques and practices which demonstrate that, with proper care and training, retarded and developmentally disabled persons can improve their skills and learn new skills far beyond what was believed possible in the 1940's and 1950's. This concept of institutionalization and care is referred to as the "developmental model." But there is also a growing awareness that the "developmental model" for care of the retarded persons has its limitations.

### A. Mental Retardation and the Residents at Grafton State School

Mental retardation is defined as significantly below average intellectual functioning, existing concurrently with deficits in adaptive behavior, and manifested during the developmental period. For a person to be diagnosed as being mentally retarded, impairments in intellectual functioning must co-exist with deficits in adaptive behavior. To determine the existence of mental retardation, standardized tests must be administered to the individual to measure I.Q. and adaptive behavior levels. Knowledge of the relationship between intelligence and adaptive behavior is incomplete. Within the framework of the accepted definition of mental retardation, an individual may meet the criteria of mental retardation at one time in life and not at some other time. A change in status may be the result of an alteration in intellectual functioning, changes in adaptive behavior, changes in the expectations of society, or for a vast

---

1. North Dakota Constitution, Art. IX, § 12(8).

2. See Session Laws 1909, Chapter 137, Vol. 2 N.D.R.C., 1943 § 25–0501 and § 25–05–01 N.D. C.C.

3. See the Index to Mental Illness, 1979 Index, N.D.C.C.

number of other known and unknown reasons.

Based upon functioning levels as determined through testing by professionals, mentally retarded persons may be described as falling into one of four functioning levels. These four levels in descending order based on ability to function are:

1. Mild;
2. Moderate;
3. Severe; and
4. Profound.*

The I.Q. ranges corresponding to each level or classification of mental retardation are as follows:

| | |
|---|---|
| Mild | 52–67 |
| Moderate | 36–51 |
| Severe | 20–35 |
| Profound | less than 20 |

Despite recent advances in the field of mental retardation and a shift in treatment philosophies and modalities, it has not been shown that all persons who are mentally retarded have the developmental potential to become self-sufficient and independent. Nor has it been shown that all mentally retarded persons are capable of continuous meaningful and significant progress.

At the time of trial there were approximately 800 persons confined at Grafton and 250 persons confined at San Haven. The residents at Grafton and San Haven are drawn mainly from those who have severe physical, intellectual, emotional and social handicaps. Approximately 496 residents are unable to dress themselves, 243 residents are unable to walk, 288 residents are unable to speak, and 371 residents are incontinent.[4]

B. *Institutional Facilities*

The Grafton campus is located on the west edge of the City of Grafton. It is adjacent to a city park and is able to utilize the city's paved street system for access. The campus is well landscaped and the trees and shrubs are mature.

The campus consists of the Professional Service Building, Collette Auditorium, the Health Service Center, Food Service Center, and the following residential halls: Sunset Hall, Wylie Hall, West Hall, Midway Hall, and North A and B complexes, plus the usual campus heating plant, shops, and so forth.

The campus is tied together with tunnels which allow winter movement among buildings. The tunnels vary in quality with the age of the buildings they serve. The tunnels also assist in maintenance of central heating and other service lines. The tunnel system, while necessary, is inadequate and dangerous, particularly when over loaded, as at mealtime.

The San Haven Campus, lying on the south slope of the Turtle Mountains, is in an attractive setting. The campus consists of the original tuberculosis sanatarium plus an addition to the east and an addition to the west. About twenty rods south of the main buildings is the food services building on the campus. The food services building and the main building are connected by a tunnel.

The remaining campus buildings are staff housing and service buildings.

The main building is largely taken up with administration and special project rooms. The east addition has three floors of large dormitories which house severe-profound retarded residents. The west addition has four floors of rooms which house the moderate and mild retarded residents, the geriatric group. There are fire doors between the main building and the additions. There is an elevator, at least in the west addition. The fire escapes are steel tubes which deposit the resident, after a controlled fall, on the north side of the

---

* An accurate determination of IQ is very difficult with persons classified as severely or profoundly retarded.

4. The population of Grafton State School is similar in disability to residents found in such institutions in other states; however, the Grafton state school confines a large number of high functioning individuals who would not be institutionalized in other states. See Sheerenburger, *Public Residential Facilities* (1978); Pl.Ex. 113.

buildings at ground level. See Pl.Ex. 903 and 1037.

In the area used by the severe-profound non-ambulatory patients, the interior is finished in the old fashioned hospital manner. That is, white ceramic tile. The old hospital, and the addition, have many windows of wood casing, vertical slide type.

Both campuses suffer from the use of excessive ceramic tile in the interior finish of the buildings. While such finish may be desirable as an aid to maintenance, including cleanliness, the result is a harsh, cold interior, with a high noise level.

Grafton is overcrowded. The chart below shows the number of residents compared to the actual capacity.[5]

| BUILDING | CAPACITY | PRESENT POPULATION |
|---|---|---|
| West | 64 | 106 |
| Annex/North B | 88 | 188 |
| North A | 35 | 108 |
| Sunset/Midway | 79 | 209 |
| Pleasant View/ Health Services | 48 | 106 |
| Wylie | 64 | 82 |

The San Haven branch, also overcrowded,[6] has two widely different classes of residents. In the east building, including the old sanitarium, are kept the severe-profound retarded and physically malformed residents, most of whom are non-ambulatory, incontinent, unable to provide any substantial self-care. These number about 125 and range in age from infants to the aged. In the west buildings are the ambulatory residents, usually moderately retarded, who are able to perform basic self-care functions, and range in age from early maturity to the aged. Some of these people have been carried over from the days of the tubercular sanitarium.

Neither of the institutions is presently equipped or maintained in such manner as to meet the state's fire and safety standards.

C. *The Funding*

On a per person basis, in 1980 North Dakota spent fewer dollars per resident than any other state in the United States. In 1981, as of June 30, the average national per diem expenditure was $77.99 per resident, compared to North Dakota's per diem of $26.42. See Pl.Exs. 113, 106.

While federal funding is available under Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, to cover approximately 62% of the operating costs of the school, Grafton and San Haven are among the 6% of public residential facilities that do not qualify for Title XIX funds. See Pl.Ex. 113, and testimony of Dr. Wisland.

D. *The Staff*

The witnesses consistently commended the staff; and this court finds that the existent professional staff is competent and dedicated to its mission. However, the facilities are understaffed, with critical shortages in:

Professional Staff
 Medical doctors
 Psychiatrists
 Psychologists
 Physical therapists
 Occupational therapists
 Educational specialist
 Nurses
Direct Care Staff
 Practical nurses
 Direct care personnel

There are also shortages in the administrative staff which result in the professional personnel being required to devote an inordinate amount of time to internal administration instead of professional resident support.

There is no staff to provide a meaningful program for the adaptation of support equipment, such as wheel chairs, tables, prosthetic equipment, dishes and eating utensils.

E. *Individualized Habilitation Plans*

In an effort to comply with 42 U.S.C. § 1396, et seq., (Title XIX), the professional

---

**5.** Testimony of Dr. Wisland, Superintendent of Grafton state school.

**6.** Testimony of Richard Charrier, Assistant Superintendent in charge of San Haven.

staff is reviewing the needs, abilities and limitations of each resident, and undertaking to set up habilitation plans responsive to what such review discloses. However, this review has not been completed, and the habilitation plans as developed do not reflect the state of the science as to either analysis of the problem or adequate remedial action. As an extreme example, one review found a resident engaged in "maladaptive" behavior. But the plan designed to effect a remedy was simply to curb the "maladaptive" behavior. Even where a meaningful plan has been developed, staff shortages and lack of facilities prevent it from being carried out.

This court realizes that the residents are all highly individualized people who require extensive support and assistance; and that, except in broad terms, no general habilitation plan can serve a substantial group of them. For example, although many residents can benefit from the swimming facilities at Grafton, each resident has his or her special need when using the pool. Just as the needs of various residents are infinitely variable, so the degrees and amount of individualized attention required for the various residents are infinitely variable.

In addition to the need for an individualized plan, there must be a constant review and revision of the plan. And this process of review and revision must be subjected to independent evaluation, if only to assure the quality of that review and revision.

I find the Individualized Habilitation Plans at Grafton state school deficient in the following respects:

a. The plans are not reflective of the existent state of the science of habilitation; and

b. There is no provision for independent evaluation of the plans; and

c. There are not adequate records to assist the professional staff to develop the plans; and

d. There is not sufficient staff to develop and keep an adequate review of the plans; and

e. There is not sufficient staff to execute, keep records on, and follow the plans; and

f. There are not sufficient facilities to allow of the execution of the plans, for example, classrooms, support equipment, direct care staff, and supplies.

F. *Institutional Programs*

In addition to recreation, training, physical therapy and occupational therapy, necessary program areas encompass medical treatment including use of drugs, correctional treatment and operative procedures; habilitation treatment, that is, self help training in toilet control, speech, self transportation, feeding skills, and so forth. And where possible, programs must extend to normalization experiences, that is, assistance in learning to move in the mainstream of a community.

Until commencement of this action, there was no adequate program for the administration of drugs in either unit of the Grafton State School. Drugs were administered so casually that drugs were delivered to the wrong residents, drugs were left unguarded among the residents, and no meaningful record of individual drug usage was kept.

Nor is there an adequate program for the use of "time-out" rooms. Those are small cells, usually closet-like rooms, where residents may be placed as a training, or disciplinary technique. The maximum allowable time in such a room is about 15 minutes. A longer time allows the resident to lose the connection between the "time-out" and the problem which caused it to be imposed. Since the residents are not fully capable of self protection they must be monitored while so confined. Yet in Grafton some time-out rooms were located so that intermediate locked doors separated them from the attendant, who was required to do his or her work where the occupant of the room could not be monitored. Also the resident often spent far more than the allotted time so confined.

Nor is there an adequate program for the serving of meals. The evidence showed

that residents were fed in dangerously awkward positions, for example, from above the resident's head. They were fed too fast. They were not equipped with adequate support tools such as special utensils and special dishes.

### G. Standard Operating Procedures

Grafton state school has written procedures for fire safety, for proper use of time-out rooms, for protection of the resident's civil rights, for education and programming of residents for release into the community, and for drug distribution and control, among others. Without adequate staff, and adequate training for new direct care staff to execute the standard operating procedures, they are not and cannot be followed.

### H. Records

The evidence disclosed that there was no policy of centralized record gathering; that the records of a given resident were distributed among the departments furnishing the separate services. The records were incomplete, and the entries showed that the care staff had no standardized training as to what was important and how to provide continuity in the records. The records of drug administration were in some cases inaccurate and incomplete.

### I. Injury to the Institutionalized Plaintiffs

In the San Haven unit committed to the severe-profound retarded, and the extreme physically disabled, the residents are crowded into large open wards, which are very noisy. They lay inactive except for limited bed care furnished by too few direct care staff who must devote most of their time to janitorial, housekeeping, and record keeping tasks. During the quiet nighttime shifts, duty personnel were often reduced to two persons on a floor. In case of fire or other emergency there was no way the attendants could empty their floor in any reasonable length of time using the fire chutes; let alone care for the residents when they dropped from the chutes at ground level. San Haven is about two miles from the city of Dunseith (population 800), so in case of emergency the non-ambulatory residents are totally dependent on the duty staff. The recreational facilities for the non-ambulatory residents consist of a small gathering room off the large dormitory, where the residents are wheeled in and left to suffer the blare of a television set. Another set is installed in the dormitory, which also is left on during the day regardless of the desires of the residents.

The ambulatory, moderately retarded, older group in the west wing have occasional trips as a group to the outside to see the geese gathering in the fall, or see a show in town, and so forth.

Grafton is a more adequate campus, with recreational facilities, a gymnasium, swimming pool, several centers making it possible to group the patients of similar capabilities. It is organized to incorporate a hospital, or aid station; areas for retarded persons having violent or dangerous propensities; and areas for more passive residents who are grouped roughly according to their capacities and needs. The most comfortable area for the retarded is that segment which seeks to prepare residents for movement into the general community.

The wards for violent or dangerous residents are quite crowded, excessively noisy, and badly understaffed. The toilet facilities, the bed stalls (a dormitory with about thirty inch vertical barriers between the beds), are all finished in ceramic tile. The "hospital model" rooms are completely open to the public. The ceramic tile reflects and magnifies all human noise.

All spaces are overcrowded and, because of the shortage of staff and resultant resident inactivity, the residents manifest widespread stereotopic behavior, rocking back and forth, picking, self-hitting, plucking at ears, eyes and nose, beating hands or head against obstacles, all of which are evidence of boredom.

The evidence demonstrated that persons with extreme physical disability, having, as they do, a reduced ability to strengthen and develop their bodies, are less likely to com-

plete a normal life span than less disabled persons. So death is a constant companion in an institution of this nature. And, because of the insufficient staff, lack of an adequate employee training program, and inadequate facilities, there is a high incidence of abuse between residents, and occasional abuses between a member of the staff and a resident.

In fact, Grafton state school contains all of those negative institutional characteristics discussed under "negative institutional characteristics," *infra* at 482.

In addition, in both units, since the direct care staff are untrained and overburdened, there is little or no interchange between and among staff and residents.

These negative conditions are harmful in themselves, and have caused regression among the residents, for example, reduced ability to communicate, reduced ability to walk or feed one's self.

### J. Improvements in the Condition of the Residents

As earlier pointed out, with the introduction of new leadership in the past few years, there has been an increased effort to upgrade the Grafton state school. The impetus has been directed primarily toward improvements at Grafton in order to reach compliance with 42 U.S.C. § 1396 (Title XIX), and thus qualify for federal assistance. To this end, many of the standard operating procedures have been drafted or revised. But these are of no benefit to the residents until staff are employed and trained in the revised procedures.

The administration of the Grafton state school, aided and even pushed by the younger, intermediate level leadership, has instituted several desirable programs. The most promising of these are programs to correct record keeping; to review and im-

plement individualized habilitation plans; to establish groupings of residents who then are assisted by a comprehensive support group, direct care nurses, therapists, plus such experts in medicine, psychology, and behavior modification as are available.

At least partially as a result of the interim court order, the drug distribution system was improved and standardized, and pharmacists were employed. The use of psychotropic drugs has been substantially reduced, and a substantial increase in the number of direct care personnel has been effected.

There still is no department for the development and adaptation of support equipment and prosthetic devices. There still is not a sufficient number of occupational and physical therapists, nor is there enough staff to train new employees.

### K. The Relationship Between the Institution and Community Residences

There is a difference of expert opinion as to whether the developmentally disabled should be cared for in institutions or in community residences. The plaintiffs' evidence fell into a distinct and repetitive pattern. Plaintiffs' witnesses, who identified with the Association for Retarded Citizens (A.R.C.), testified almost as in a litany, that all institutions were bad; that community centers (group homes) were better; that foster homes were still better; that remaining in the family home was best for the retarded-handicapped person.[7] While these witnesses universally condemned institutions, they could not agree as to what was not an institution and what was a community center. The standard used by them was number of residents, but that varied greatly. Some witnesses saw a unit housing 100 people as a non-institution, others used the figure of 50, then others used 10, 6, or 4.

---

**7.** A few A.R.C. witnesses and witnesses who identified themselves with the American Association on Mental Deficiency were less dogmatic when discussing the matter of institutionalization. But A.R.C. witnesses generally demonstrated a sort of intellectual inbreeding when they were discussing institutionalization. It was as though the witnesses had talked only to those of like opinion. When the A.R.C. witnesses moved over into their areas of special expertise, their observations and conclusions became far less dogmatic. There was apparent also a hint of polarization developing between witnesses who identified with A.R.C. and those who identified with the American Association of Mental Deficiency.

Those witnesses who approached the matter less dogmatically identified certain characteristics which they associated as negative institutional conditions and which they testified could arise and must be guarded against wherever a retarded person lived. These "negative institutional characteristics" included:

 a. Non-communication and non-association between the resident and the care personnel.

 b. A pattern of treatment of the resident as an infant or a non-person.

 c. An absence of privacy for the resident.

 d. A deprivation of the right of self-determination in little things, for example, what to wear, what to eat, and to do as recreation, and who to talk to.

 e. Unimaginative and drab meals.

 f. Use of clothing in common, like room arrangements, like furniture, like ornamentation.

 g. Isolation from contacts and experiences outside the residence.

An objective study of the problem concluded that these conditions could and did arise in community homes and foster homes as well as "institutions."[8]

In order to understand the relationship of institutional care (including community centers and foster homes), to non-institutional support of the mentally retarded and physically disabled, we must digress briefly. Throughout the nation about 3% of the total population are born, come into this world physically and/or mentally defective. This is called the "incidence of retardation." Of that 3%, two-thirds, after they get beyond the monitoring effect of the school systems are lost into the general population because they are sufficiently adaptive. The remaining 1% identified as the "prevalence of retardation" represent special housing and special care problems. It is easily seen that those persons within the 1% group are the most seriously retarded and disabled, and from this 1% are drawn the institutionalized residents.[9]

A centralized facility, an institution, is best able to care for those among the 1% who fall generally into these groupings:

1. Developmentally disabled persons who, with reference to the level of retardation, are anti-social, aggressive, assaultive, unmanageable.

2. Developmentally disabled persons who have extensive medical needs, who need constant care of a kind, because of progressive conditions, that cannot be easily satisfied in most community settings.

3. Developmentally disabled persons who by virtue of severe intellectual handicaps have little awareness of common dangers, who by virtue of hyperactivity or other behavioral management problems cannot be supervised and monitored and controlled either in their own homes or some other kind of community setting.[10]

All experts agreed that where possible the family home was the best place for the retarded person. But they also agreed that the cost of economic, emotional, physical and mental strains on remaining family members could be much greater than the cost of some arrangement for care of the person by the state.

Foster homes are desirable provided the foster homes represent stable arrangements, that is, arrangements lasting more than a few months.

Community homes are also desirable; but as in the case of a foster home or family home, there must be adequate community based support systems; that is, there must be medical support, occupational and physical therapy, provision for rest and release for the caretakers (respite care of the resident), and support from the educational sys-

---

8. See Bercoriei, Institutional Practices in Community Residences. Def.Ex. 281.

9. Transcript of testimony of Baumeister, p. 48.

10. Transcript of testimony of Begab, p. 16.

tem.[11] The central institution can provide the full array of services, including these additional services:

a. Diagnosis
b. Genetic counseling
c. Respite care
d. Intensive training in special problem cases, for example, intensive training in self-care skills for Down's syndrome preschool aged children, or to correct maladaptive behavioral problems for a person who has been returned from a community home.
e. A training resource for public health nurses, social workers, educators and others who must support the community centers, foster homes and private homes having retarded children.
f. Research
g. Experience for interns.

### L. Cost of Institutions As Against Community Centers, Foster Homes and Family Homes

The studies presented and the comments of the experts were not persuasive in this area. The studies suggested that institutions were the most expensive, community homes less expensive, foster homes even less expensive, and family homes least expensive.

But the studies demonstrated that in reality institutions appeared to be most expensive because most costs were visible, i.e., medical, social service, therapy, recreation and education were all accountable against the institution. Community homes, foster homes and family homes utilize the services available in the community, for example, the school system for education and recreation, the community social services for counseling and emergency nursing, the community police for protection, and religious organizations for social experiences. In addition, foster parents and natural parents give hours of labor and attention that community home and institution personnel would not give. And natural parents give of the family income to meet the needs of the retarded person.

From all of the evidence presented, I conclude that institutional care is not shown to be greater or less expensive than community, or foster, or home care. Instead, the evidence shows that by use of community care, foster care, and family care, the cost of care is partially shifted back to the local communities.

### M. Recruitment and Training of Direct Care and Professional Staff for Institutions, Community Homes, and Foster Homes

Under existing North Dakota programs, the Superintendent at Grafton is charged with recruitment and training of staff for the Grafton state school. The Director of the Department of Public Services is charged with the development of group homes and foster homes, and, therefore, is concerned with recruitment and training of non-institutional personnel. Neither the staff of the Grafton state school, nor the staff of the Director of Public Services is adequate to meet the recruiting demands of these departments.

At the present time, in addition to the medical and specialist education programs at the University of North Dakota, and the various nurse education programs, there are specialist and para-professional programs at least in Minot State College, Wahpeton

---

11. The current community home program of North Dakota developed exclusively by non-profit organizations include the following:

| | |
|---|---|
| Fargo | The Valuation and Training Center operates Fraser Hall |
| Grand Forks | Aggasiz Enterprises |
| Bismarck | Pride Industries |
| Minot | Vocational Adjustment Workshop |
| Valley City | Open Door (the first in the nation to use FHA funding to build the housing unit.) |
| Devils Lake | New Outlooks |
| Jamestown | A day care center in the state hospital called Alpha, Inc., and a resident program called Outlook, Inc. |
| Williston | UMARC (Upper Missouri Association for Retarded Citizens) |
| Harvey | The school district has a residential unit. |

The testimony was not clear as to programs in Dickinson, Bowman and Mandan.

School of Science, and the State University at Fargo.

Obtaining adequate professional staff at San Haven is difficult because San Haven is located in an isolated area of the state, at least 90 miles from any city of more than 10,000 population. Staffing of professionals at Grafton is also difficult because Grafton is a city of only 6,000 people. Grafton, however, is only 39 miles north of Grand Forks which can provide the resources available at the University of North Dakota, and a strong medical community.

### N. *Public Education of the Developmentally Disabled*

The North Dakota Constitution provides in Article VIII, Sections 1 and 2, for a system of public schools which shall be open to "all children," and "extending through all grades." These provisions were held, *In Interest of G.H.,* 218 N.W.2d 441 (N.D. 1974), to mean that handicapped children who can benefit from an education have a right to that education.

The parameters of that decision have not yet been finally established but the North Dakota statutes provide for a program of transfer of students among school districts so that centers can develop the necessary staff and facilities and thus care for handicapped children from smaller, less developed school districts. An example of such a broad community service is found in the program at Harvey, North Dakota.

### III. RIGHTS OF THE MENTALLY RETARDED UNDER THE UNITED STATES CONSTITUTION, FEDERAL STATUTES, AND NORTH DAKOTA LAW

### A. Constitutional Rights of the Mentally Retarded.

■ If North Dakota chooses to operate facilities for the mentally retarded, the operation of these facilities must meet minimal constitutional standards, and the obli-

gation to meet those standards may not yield to financial considerations. *Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir.1977), and *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir.1968). The Constitution requires that North Dakota either provide adequate funding to bring its facilities into compliance with constitutional standards, or abandon such facilities.

### 1. RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

Numerous courts have declared that involuntarily committed residents of mental institutions have rights under the fourteenth amendment.[12] Yet before proceeding to examine the nature of these rights, we must examine the state's contentions that most residents of the Grafton state school are voluntarily admitted; and that due process rights of the mentally retarded only apply to those persons who are involuntarily committed to state institutions. This court finds both of the state's contentions unconvincing.

■ First, the plaintiffs who are residents of the Grafton state school have not, in most cases, voluntarily consented to their confinement in any meaningful sense of the word "voluntary." North Dakota Century Code, Chapter 25–04, allows for the admission of mentally deficient persons upon the application of a parent or guardian without the consent of the person involved. The statute in no way makes the consent of the person concerned a condition of admittance. Further, in the case of plaintiffs who are severely retarded, informed consent is not even possible. And even in the case of the plaintiffs who are capable of giving informed consent to admission, it may be questioned whether such consent is voluntary in light of pressures from family and the high cost and unavailability of alternative care.

This court's finding that plaintiffs have not voluntarily entered the Grafton state

**12.** See, e.g., *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn. 1974); *Wyatt v. Stickney,* 325 F.Supp. 781 (M.D.Ala.1971).

school is well supported by other courts. The court in *Kentucky Assoc. for Retarded Citizens v. Conn,* 510 F.Supp. 1233, 1248 (W.D.Ky.1980) stated:

> The defendants take the position that every resident at Outwood is voluntarily committed and has the right to seek his or her own discharge at any time, which right will be forthwith granted. This argument overlooks the obvious, to wit: the fact that the great majority of profoundly and severely mentally retarded persons are simply incapable of making decisions as to whether it is in their best interest to be placed in a M.R.R.T.C. or not.

And the court in *Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295, 1311 (E.D.Pa.1977) wrote:

> [T]he notion of voluntariness in connection with admission as well as in connection with the right to leave Pennhurst is an illusory concept. Few if any residents now have, nor did they have at the time of admission, any adequate alternative to their institutionalization.

See also, *New York Association for Retarded Children Inc., v. Rockefeller,* 357 F.Supp. 752, 762 (E.D.N.Y.1973).

■ Second, if the plaintiffs had voluntarily consented to their admission to the Grafton state school, it would not follow that all their rights to liberty under the due process clause were waived by that consent, as the state claims (Def.Supp.Post-Tr.Br., p. 3). It is obvious that when a person submits to confinement in a state institution he surrenders some of the rights to freedom of movement that he would enjoy outside that institution. But the institutionalized re-

tarded person retains residual rights to liberty.[13] And these rights are violated when the institution officials or their agents place the resident in conditions which are not reasonably safe or which result in unreasonable curtailment of the person's freedom of movement. See *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

If the state were correct in its contention that fourteenth amendment rights to safety and freedom from bodily restraint do not apply to voluntarily committed residents, then the state arguably could chain confined residents to their beds and administer wanton physical beatings without violating the constitution. This shocks the conscience, and represents a complete abdication of the state's constitutional duty to respect the rights of all its citizens to fundamental liberty.[14] An individual's liberty is not less worthy of protection merely because he has consented to be placed in a situation of confinement.

■ Having determined that plaintiffs fall within the ambit of fourteenth amendment rights to liberty, we must address the question of the scope of these rights.[15] The controlling case is the United States Supreme Court's recent decision in *Youngberg, supra.* In that case the respondent, Romeo, a mentally retarded person who was involuntarily confined to a Pennsylvania state institution sued institution officials for damages under 42 U.S.C. § 1983 concerning injuries he had suffered at the institution. The appeal was addressed to the recital of proper standards in the jury instructions. The Court held that the respondent had four specific rights covered

---

**13.** Even persons confined in penal institutions have residual rights to liberty. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

**14.** Indeed, the denial of liberty rights to voluntarily committed patients may itself violate the state's fourteenth amendment duty to give all its citizens equal protection of the law. See, Mason & Menolascino, *The Right to Treatment for Mentally Retarded Citizens: An Evolving*

*Scientific and Legal Interface,* 10 Creighton L.Rev. 124, 127 (1976).

**15.** It should be noted that the mentally retarded have such rights only by virtue of the state's decision to provide care and treatment facilities for them. The state has no affirmative duty to provide such facilities, but if it does, then it must operate those facilities in a manner consistent with the constitutional rights of the residents. See, *Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir.1977); *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

under the due process clause right to liberty:

1. A right to adequate food, shelter, clothing and medical care; [16]
2. A right to reasonably safe conditions;
3. A right to freedom from restraint, except insofar as professional judgments determine such restraints necessary to assure a resident's safety or to provide needed training; and
4. A right to such training as professional judgment determines is reasonable to ensure a resident's safety and to facilitate his ability to function free from bodily restraints.

—— U.S. at ——–——, 102 S.Ct. at 2458–63.

The first right, the right to adequate food, shelter, clothing and medical care, imposes a standard that addresses the overcrowding in the Grafton state school, the misuse of medication, the shortage of staff to perform necessary functions, and the unavailability of adequate dental care.

The second right, the right to reasonably safe conditions, imposes a standard for this court's determinations regarding fire procedures, the adequacy of supervision in dangerous situations, and dangerous conditions that exist in the institution such as slippery floors, crowding in the tunnels, and harmful noise levels. This right also concerns the resident's safety from attack by others.

The third right, the right to freedom from undue restraint, imposes a standard for the court's determination whether professional judgment is being exercised in the use of medication and physical means to restrain residents. This right obligates the state to provide capable retarded residents with reasonable opportunities to make trips into the outside communities. It also tests the freedoms allowed to residents, such as the opportunity to make small personal decisions concerning what to wear, what to eat, recreation, etc. This right against unreasonable restraint also involves the much discussed question of alternatives to institutionalization, such as community homes. Prior to the *Youngberg* decision, this court held that the fourteenth amendment secures a right to the least restrictive practicable alternatives to institutionalization. See, *Welsch v. Likins,* 373 F.Supp. 487, 501–2 (D.Minn.1974). But see, *Sanchez v. New Mexico,* 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970) (appeal claiming right to least restrictive alternatives to institutionalization dismissed for lack of a federal question). While the *Youngberg* decision does not directly address this specific right, the Court's analysis indicates that it would reject an absolute right to the least restrictive alternatives. The Court starts from the premise that rights granted under the fourteenth amendment concept of liberty must attach to basic liberty interests, such as the interests in a safe environment or in personal security. —— U.S. at ——–——, 102 S.Ct. at 2452–63. Following this analysis, this court must conclude that a constitutional right to the least restrictive method of care or treatment exists only insofar as professional judgment determines that such alternatives would measurably enhance the resident's enjoyment of basic liberty interests.

The fourth right, the right to minimally adequate training, bears here upon the use of a skills and needs inventory to assess the development of each resident and the availability of staff and facilities to supply the training necessary for acquisition of needed skills.[17] The court in *Young-*

---

16. The Supreme Court stated: "Indeed the state concedes that respondent has a right to adequate food, shelter, clothing, and medical care. (footnote omitted) We must decide whether liberty interests *also* exist in safety, freedom of movement, and training." (Emphasis added.) —— U.S. at ——, 102 S.Ct. at 2458. In using the word "also" the Court clearly implies that there is a fourteenth amendment liberty interest in adequate food, shelter, cloth-

ing and medical care. This liberty interest is perhaps premised on the observation that these conditions are necessary for the exercise of basic liberties.

17. In its November 4, 1981 Decree and Order, this court ordered the state to hire personnel to conduct skills and needs inventories of residents and, in addition, to hire additional psychologists and physical and occupational thera-

*berg* limited the scope of the right to that training which is minimally adequate in light of the individual's interests in liberty. —— U.S. at n. 25, ——, 102 S.Ct. at n. 25, 2460. Thus, the resident possesses a right to training only insofar as that training serves to enhance or further that resident's exercise of basic liberty.

The court in applying these standards is specifically enjoined to recognize that "... a decision if made by a professional is presumptively valid." *Youngberg, supra,* at ——, 102 S.Ct. at 2462.

▮ In so limiting the scope of the right to training, it is important to note that the Court did not adopt the position taken by other courts [18] that a resident has a right to such training as will cure or improve his mental condition. As noted above, the Court held that a resident has a right to training only insofar as that training will further the patient's liberty interests. This court, therefore, must examine the particular type of training in question to determine whether it furthers the residents' basic interest in liberty. Thus training in music or vocational skills would not be constitutionally required by due process because it would not advance basic liberty interests. But, training in walking or in basic communication would be required if the resident could benefit therefrom, since these skills enable the exercise of basic liberties.

▮ Further, the right to minimally adequate training can be reasonably construed to grant a right to reasonable training which enables the resident to acquire or maintain *minimum* self-care skills—skills in feeding, bathing, dressing, self-control, and toilet training.[19] Justice Blackmun, writing for the three-member concurrence in

*Youngberg, supra,* argues that mentally retarded residents have a right to such training as will enable them to maintain the *minimum* self-care skills that they possessed when they entered the institution. —— U.S. at ——, 102 S.Ct. at 2463–65. This right attaches because the loss of these skills is "... a loss of liberty quite distinct from—and as serious as—the loss of safety and freedom from unreasonable restraint." *Id.* Justice Blackmun writes:

> For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.

—— U.S. at ——, 102 S.Ct. at 2464. This court finds Justice Blackmun's argument convincing. Given the great difference that *minimum* self-care skills make in the life of most mentally retarded persons, this court regards the acquisition and maintenance of those skills as essential to the exercise of basic liberties. Not only will these skills free residents from the restraint of others who now "help" the residents perform basic functions, these skills will also enable the residents to do a great variety of activities which formerly they could not.

Before closing this discussion of due process, we must address two additional contentions that plaintiffs raise. First, plaintiffs contend that the Supreme Court's requirement that trial courts show deference to the judgment of qualified professionals, —— U.S. at ——, 102 S.Ct. at 2460–61, does not apply to this lawsuit for *injunctive* relief. The plaintiffs cite language of the court to the effect that deference to professionals is required so that professionals do not have

---

pists. The state having failed to comply with either order within a reasonable time, on May 7, 1982 the court ordered the state to hire the additional personnel or to transfer all residents to other institutions.

**18.** *Wyatt v. Stickney,* 325 F.Supp. 781, 784 (M.D.Ala.1971); *Welsch v. Likins,* 373 F.Supp. 487, 491–500 (D.Minn.1974). Although these courts refer to "treatment" rather than "train-

ing," these terms are for the most part synonymous.

**19.** The Court in *Youngberg* apparently reserved its judgment as to whether there exists a constitutional right to such training that would afford retarded persons a reasonable opportunity to acquire or maintain minimum self-care skills. —— U.S. at ——, n. 23 on p. ——, 102 S.Ct. at 2459 n. 23 p. 2459.

to make decisions in the shadow of an action for damages. —— U.S. at ——, 102 S.Ct. at 2462–63. From this, the plaintiffs reason that the court would not give deference to professional judgment when an action is for injunctive relief and not for damages.

■ However, that argument rests on the false assumption that the only reason underlying the Court's mandate for deference to professional judgment is the risk of liability for damages. In fact, all of the cases which the Court initially cited to support its mandate involved claims for injunctive relief. See, —— U.S. at n. 29, pp. —— – ——, 102 S.Ct. at n. 29, 2461–63. This fact strongly suggests that Court had other reasons in mind for mandating deference than simply to free officials from the threat of damages. The two most obvious reasons that come to mind are the principle of federalism—that is, to allow states to manage their own affairs with minimum federal interference—and the observation that state institutions will be more effectively run if judicial interference is kept to a minimum. See, id. Given these additional reasons, this court considers itself bound by the Court's mandate to show deference to the judgment of professionals, although the showing of deference does not mean binding and unquestioned acceptance.

■ Second, plaintiffs contend that the due process clause guarantees a right to "habilitation" of the mentally retarded because the only rational purpose the state can have for involuntarily confining the mentally retarded is for habilitation.[20] As support they cite Welsch v. Likins, 373

F.Supp. 487, aff'd in part, vacated and remanded in part, 550 F.2d 1122 (8th Cir. 1977). See also, Halderman v. Pennhurst State School & Hospital, 446 F.Supp. 1295, 1315–16 (Pa.1977). A full statement of the argument goes as follows: (1) the state must have a compelling state interest to compromise a person's liberty by confining him or her; (2) the only compelling interest the state could have in confining the mentally retarded is to offer them treatment; (3) thus, the state must provide treatment to the mentally retarded persons it confines.

This court does not find this argument fully convincing, First, while the Court in Youngberg reserved its judgment as to whether the constitution guarantees a right to treatment per se, —— U.S. at ——, n. 23, 102 S.Ct. at 2459, n. 23, its analysis does not square with the broad argument set out above. The Court closely tied the right to training to particular liberty interests instead of, as plaintiffs now urge, broadly assuming that the deprivation of liberty which accompanies confinement can only be justified by providing habilitation.

Second, it may be questioned, in light of the unavailability of alternatives and the reduced ability of mentally retarded persons to exercise liberty, whether placing these persons in state facilities compromises a fundamental liberty interest.[21] And, Third, even if a fundamental liberty interest is infringed, it is reasonable to believe that the state may have a compelling interest in just safekeeping—rather than habilitating—mentally retarded persons. Such safekeeping is necessary to protect the mentally retarded from injuries that would

20. Plaintiffs define "habilitation" by reference to the Accreditation Council for Services for Mentally Retarded and Other Developmentally Disabled Persons, Standards for Services for Developmentally Disabled Persons, (1981 Edition) as:

The process by which the staff of an agency assists an individual to acquire and maintain those life skills that enable the individual to cope more effectively with the demands of his or her own person and environmental and social functioning. Habilitation includes, but is not limited to, programs of formal, structured education and treatment.

21. See, New York State Association for the Retarded Children, Inc. v. Rockefeller, 357 F.Supp. 752, 759–60 (E.D.N.Y.1973) ("There is a significant difference between the state requiring commitment as an alternative to criminal incarceration and the state providing a residence for the mentally retarded. The residents of Willowbrook are for the most part incapable of existing independently unless successfully habilitated."); Bell v. Wolfish, 441 U.S. 520, 538–39, 99 S.Ct. 1861, 1873–74, 60 L.Ed.2d 447 (1978) (Rational basis test used to evaluate legitimacy of pre-trial detention).

result to themselves and others if the mentally retarded were not so confined. Justice Blackmun's three-member concurrence in *Youngberg* supports this finding:

> In *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), this Court, by a unanimous vote of all participating Justices, suggested a constitutional standard for evaluating the conditions of a civilly-committed person's confinement: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.,* at 738, 92 S.Ct. at 1858. Under this standard a State could accept a person for "safekeeping," then constitutionally refuse him treatment. In such a case, commitment without treatment would bear a reasonable relation to the goal for which the person was confined.

—— U.S. at ——, 102 S.Ct. at 2463.[22]

## 2. RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

█ The equal protection clause directs that "all persons similarly situated shall be treated alike." *In Re: Alien Children Litigation,* 457 U.S. 202, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). In applying the equal protection clause, generally the court seeks only the assurance that any difference in treatment between similarly situated persons bears some fair relationship to a legitimate public purpose. *Id.* But when this difference in treatment impinges on a "fundamental right" or disadvantages a "suspect class," the court must determine whether the difference in treatment is precisely tailored to serve a compelling governmental interest. *Id.*

Plaintiffs make two contentions based on the equal protection clause of the Fourteenth Amendment. First, they assert that the class of mentally retarded does not receive the same level of education relative to their needs that other non-retarded citizens receive. Education, they argue, is a fundamental right under the North Dakota Constitution, and the class of the mentally retarded a "suspect" class under both the North Dakota and United States Constitutions. Hence, plaintiffs argue that the state must have compelling reasons to justify any disparities in educational opportunities that exist between the retarded and normal children.

Second, the plaintiffs claim that the class of mentally retarded persons who are institutionalized do not receive the same level of treatment as the class of mentally retarded persons who live in community treatment centers. Apparently, plaintiffs assert that institutional residents are of themselves a "suspect" class under the North Dakota and United States Constitutions. Again, plaintiffs assert that the government does not have a compelling reason for discriminating between institutional and community residents, and hence must give to the institutional resident a level of treatment comparable to that received by community residents.

█ Plaintiffs' first argument, insofar as it is based on North Dakota law, is sound. The Supreme Court of North Dakota has held that "all children have the right, under the State Constitution, to a public school education" and that "[h]andicapped children are certainly entitled to no less (education) than unhandicapped children under the explicit provisions of the (North Dakota) Constitution." *In Interest of G.H.,* 218 N.W.2d 441, 446 (N.D.1974). Further, the North Dakota Supreme Court suggested that the class of severely handicapped people constitute a "suspect" class because members of this class possess immutable characteristics determined by the accident of birth, citing three United States Supreme Court opinions to support this conclusion. 218 N.W.2d at 447. From these

---

**22.** Justice Blackmun goes on to say that when the person is confined for "care and treatment" due process might well bind the state to insure that the conditions of his confinement bear a reasonable relation to each of those goals.

In North Dakota "All persons with developmental disabilities have a *right* to appropriate treatment, services and habilitation for those disabilities." Section 25–01.2–02; North Dakota Century Code. (Emphasis added.)

premises, it concluded that severely handicapped children are entitled to an equal educational opportunity. *Id.* Similarly, this court concludes that, under North Dakota law, the state must afford mentally retarded persons an equal educational opportunity unless it can demonstrate compelling reasons why it should not do so.

 But insofar as the plaintiffs' first claim rests on a finding that the mentally retarded are a "suspect class" under the equal protection clause of the Fourteenth Amendment, that claim must fail. Education is not a fundamental right under the Constitution of the United States. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297–98, 36 L.Ed.2d 16 (1973); *In Re: Alien Children Litigation,* 457 U.S. 202, 219–22, 102 S.Ct. 2382, 2396–97, 72 L.Ed.2d 786 (1982). Further, this court does not believe that the class of mentally retarded citizens constitutes a "suspect class" under the federal constitution. The United States Supreme Court on several occasions has relied on three criteria for determining whether a class is "suspect:"

1. Whether the class has a history of purposeful unequal treatment. *Rodriguez, supra,* 411 U.S. at 28, 93 S.Ct. at 1294.

2. Whether the class has been relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. *Id.*

3. Whether the class is generally denied legal benefits on the basis of stereotyped characteristics not truly indicative of their abilities. *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976) (Per curiam).

This court finds that the class of mentally retarded fails to satisfy these criteria in two respects. First, the mentally retarded, now unlike times past, have political clout. This fact is evidenced by the sweeping legal reforms concerning the rights of the mentally retarded that have occurred in nearly every state as well as by the enactment of federal legislation aimed at improving the conditions of the handicapped. Second, although the mentally retarded have been victims of stereotypical thinking, the discrimination has often been a reflection of the fact that the mentally retarded do have a reduced capacity for personal relations, economic choice, and physical control. Hence, much of the legal discrimination suffered by the mentally retarded is rationally related to disabilities they possess. *Cf., Doe v. Colautti,* 592 F.2d 704, 711 (3rd Cir.1979); *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973).

 Although this court does not grant "suspect class" status to the plaintiffs, it is acutely aware, from the evidence received at trial, of the extent to which the mentally retarded still suffer from some discrimination that is not related to actual disabilities. For this reason, the court believes that state action concerning retarded persons must be reviewed under a level of scrutiny higher than the rational basis test. To this end, the court will adopt the intermediate level of scrutiny applied by the United States Supreme Court on several occasions. *See, Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *In Re: Alien Children Litigation, supra,* 457 U.S. at 218 & n. 16, 102 S.Ct. at 2395 & n. 16. Hence, in applying the equal protection clause of the United States Constitution, this court requires the state to show that disparities in educational opportunity which exist between the mentally retarded and other citizens substantially furthers important state interests.

 The plaintiffs' second argument apparently rests on the claim that institutionalized retarded residents are of themselves a "suspect class." This class, by definition, is narrower than the class of all retarded persons discussed above. Yet, for the same reasons that the court found all retarded persons are not a suspect class, this court finds that institutionalized retarded persons are not a suspect class. Further, since plaintiffs claim discrimination exists be-

tween subclasses of the retarded themselves, the reasons advanced above for applying intermediate scrutiny are inappropriate. Thus, this court holds that the state must justify any difference in the treatment provided institutionalized and non-institutionalized retarded persons by showing that this difference in treatment is rationally related to a legitimate state purpose.

### 3. CONSTITUTIONAL RIGHTS TO PRIVACY, PRIVATE PROPERTY, AND FREE ASSOCIATION

Recent decisions of the Supreme Court and courts of appeals indicate that the right to privacy consists of two interrelated strands: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977); quoted in *Fadjo v. Coon,* 633 F.2d 1172, 1175 (5th Cir.1981).

■ Here both strands of the right to privacy have application. The first strand applies in that many of the mentally retarded residents at Grafton and San Haven are left fully naked in front of each other and assistants and such residents are not provided places where they can be in private. Federal courts repeatedly have held that prisoners in state prisons have a constitutionally protected right not to be viewed fully naked by strangers, particularly strangers of the opposite sex. *See, Bowling v. Enomoto,* 514 F.Supp. 201, 203 (N.D.Cal. 1981); *York v. Story,* 324 F.2d 450, 455 (9th Cir.1963), *cert. denied, Story v. York,* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964). The court in *York* stated:

> We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figured (sic) from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and dignity.

324 F.2d at 455. Similarly, retarded residents have a legitimate privacy interest in not being viewed unclothed. While this court is mindful that not all mentally retarded persons have the capacity to appreciate privacy, this court believes that insofar as residents possess this capacity, the state must make reasonable efforts to see that residents are properly clothed.

■ Further, the state must provide those residents who are capable of appreciating private space, with reasonable access to such places of privacy. The desire for private space is a basic human desire and to deny the mentally retarded this experience of privacy is to deny them the "elementary self-respect and dignity" of which the *York* court spoke.

■ The second strand, as stated above, deals with a person's right to make certain kinds of important decisions. This strand applies to this lawsuit in that certain residents at Grafton having the capacity to do so, are denied the opportunity to decide for themselves how to dress, i.e., they are forced to wear institutional clothing. Dress is universally recognized to be an extension of one's personality, and indeed, can be pivotal in the development of one's personality. This interest in the expression and development of one's personal identity is precisely the sort of interest the right to privacy is meant to protect.

> If what the United States Supreme Court itself has termed the right of "personal privacy," *Carey v. Population Services International,* 431 U.S. 678, 684, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), means anything, it should safely encompass an individual's right to be free from unwarranted governmental intrusions into matters so fundamentally affecting a person as one's personality, self-image, and indeed, one's very identity.

*BenShalom v. Secretary of Army,* 489 F.Supp. 964, 975 (E.D.Wis.1980). For these reasons institution officials must allow capable residents a reasonable opportunity to dress themselves in individualized clothing. To provide this opportunity, the state, of course, must give residents reasonable ac-

cess to places where they can safely keep such clothing.

■ Closely connected to the right of privacy is the resident's right to private property under the Fourteenth Amendment of the United States Constitution. To uphold this right, the state must adequately provide for an accounting of the resident's personal property and for a safe place of storage. When it is possible for residents to have access to such property without danger to themselves or others, the state must allow residents reasonable access to their property.

■ Finally, the mentally retarded residents possess a right to free association guaranteed under the First Amendment. *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). This right requires that the state provide residents who are capable of communicating, reasonable opportunities to communicate with others both inside and outside the institution where they reside. *See,* 417 U.S. at 826, 94 S.Ct. at 2806.

B. The Rights of the Mentally Retarded in North Dakota Under Federal Legislation.

1. THE EDUCATION FOR ALL HANDICAPPED CHILDREN ACT OF 1975, 20 U.S.C. § 1401, et seq.[23]

The Education for All Handicapped Children Act provides federal funding to assist state and local agencies in educating handicapped children. The Act defines "handicapped children" to include children who are mentally retarded, seriously emotionally disturbed or burdened by special learning disabilities, § 1401(1). The Act requires special educational services for children "regardless of the severity of their handicap," §§ 1412(2)(C), 1414(a)(1)(A). It applies to all handicapped children within the state between the ages three and twenty-one, except that children aged three to five and

eighteen to twenty-one need not be educated if doing so would be inconsistent with state law or practice, § 1412(2)(B). Since in North Dakota only children aged six to twenty-one are eligible for free public education, the Act only applies here to persons in that age group.

In order to qualify for federal assistance under this Act, a state must demonstrate (through a state plan submitted to and approved by the Commissioner of Education, § 1413) that it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). The Supreme Court has held that the requirement of "appropriate education" does not require a state to maximize the potential of each handicapped child commensurate with the opportunity provided non-handicapped children, but rather requires the state to provide "personalized instruction with sufficient support services to permit the child to benefit from that instruction." *Board of Education of the Hendrick Hudson Central School District v. Rowley,* —— U.S. ——, ——, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982).

States receiving funding under the Act must provide education to handicapped children by priority, first, "to handicapped children who are not receiving an education," second, "to handicapped children . . . with the most severe handicaps who are receiving an inadequate education," § 1412(3). Section 1412(5) requires the state to establish procedures that assure:

. . . to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classrooms with the use of supplementary

---

**23.** The State of North Dakota receives funding under this Act to provide for the education of handicapped children.

aids and services cannot be satisfactorily achieved. . . .

■ In summary, the Education for All Handicapped Children Act requires North Dakota to give a free appropriate education to mentally retarded persons aged six to twenty-one in as normal an educational setting as possible.

2. SECTION 794 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794.

Section 794 provides in part:

No otherwise qualified handicapped individual in the United States, as defined in § 706(6) of this title, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

■ In enacting Section 794, Congress has in effect codified the constitutional right to equal protection with respect to handicapped individuals. *Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295, 1323 (E.D.Penn.1978). Because the mentally retarded are clearly "handicapped individuals" within the meaning of this section (42 Fed.Reg. 22687; *Halderman, supra*), this section reinforces the conclusion of the above equal protection discussion, that the state must give the mentally retarded equal educational opportunities.

C. Rights of the Mentally Retarded Under North Dakota State Law.[24]

North Dakota law, chapter 25–01.2, N.D.C.C., confers on the mentally retarded a panoply of rights. The principal section which concerns the treatment and habilitation of the retarded is section 25–01.2–02, N.D.C.C.:

*Appropriate treatment, services, and habilitation—Treatment in the least restrictive appropriate setting. All persons* with developmental disabilities have a right to appropriate treatment, services, and habilitation for those disabilities. Treatment, services, and habilitation for developmentally disabled persons shall be provided in the least restrictive appropriate setting.

Section 25–01.2–01(1) defines "developmental disability" was:

. . . a disability which meets all of the following conditions:

a. Is attributable to a mental or physical impairment or combination of mental and physical impairment.

b. Is manifested before the person attains age twenty-two.

c. Is likely to continue indefinitely.

d. Results in substantial functional limitations to the person's ability to function normally in society.

Section 25–01.2–01(3) defines "least restrictive appropriate setting" as:

. . . that setting which allows the developmentally disabled person to develop and realize his fullest potential and enhances the person's ability to cope with his environment without unnecessarily curtailing fundamental personal liberties.

Chapter 25–01.2, N.D.C.C., also provides the mentally retarded with the following rights:

(1) A right to a "free and appropriate education in the least restrictive appropriate setting in accordance with Chapter 15–59." 25–01.2–13, N.D.C.C.

(2) A right to "appropriate and adequate medical and dental services." 25–01.2–07, N.D.C.C.

(3) A right to an "individualized habilitation plan." 25–01.2–14, N.D.C.C.

(4) A right to be free from unnecessary and inappropriate medication. 25–01.2–08, N.D.C.C.

(5) A right "to vote at elections," "to reasonable opportunities to interact with members of the opposite sex," and "to con-

---

**24.** The rights of the mentally retarded to an equal educational opportunity under North Da- kota law are discussed *supra* at 490.

fidential handling of personal and medical records." 25–01.2–03, N.D.C.C.

(6) A right to "receive, possess, and use lawful personal property" and to "a secure, convenient, and reasonable amount of storage space for that property." 25–01.2–05, N.D.C.C.

(7) A right to be free from unnecessary seclusion or physical restraint. 25–01.2–09(2) and (3), N.D.C.C.

## IV. ORDER

Based upon the foregoing:

IT IS ORDERED that the following relief be awarded:

1. Defendants, their successors, officers, agents, servants, employees, and all persons in active consort with them, are permanently enjoined from failing to implement fully and with dispatch each of the requirements ordered herein.

2. Defendants are permanently enjoined to:

a. Develop and provide for every class member, subject to developmental disability as defined by § 25–01.2–01, N.D.C.C., a written individualized habilitation plan, based upon appropriate and reliable professional assessments, formulated in accordance with Accreditation Council for Services for Mentally Retarded and Other Developmentally Disabled Persons (ACMR/DD), *Standards for Services for Developmentally Disabled Individuals* (1981 edition), and reviewed and updated as necessary. As to those class members confined in the Grafton state school, the habilitation plans shall be developed by September 1, 1983;

b. Provide each class member eligible for State care for the developmentally disabled under North Dakota State Statute with appropriate food, clothing, shelter, medical care, education, and habilitation, regardless of age, degree of retardation or handicapping condition;

c. Provide an environment designed to assure privacy and dignity, and to pro-tect each class member residing in an institution or community based facility from physical injury or damage, regression in physical, social, intellectual and emotional abilities and other harm;

d. Collect data sufficient to demonstrate that services, treatment or habilitation provided have helped each class member to progress to the extent possible in the following domains:
Physical development and health,
Mobility,
Self-help and social skills,
Cognitive or academic skills,
Vocational skills, and
Recreational skills.

e. Establish, staff and equip an Adaptive Equipment Service Unit.

3. Defendants are hereby permanently enjoined from using physical or chemical restraints as punishment, for the convenience of staff, as a substitute for programming or when not an integrated part of an individualized habilitation program designed to lead to a less restrictive habilitation program designed to lead to a less restrictive means of behavior management.

4. Defendants are hereby enjoined to expand and maintain a statewide service delivery system, i.e., a comprehensive continuum of services for the diagnosis, evaluation, habilitation and rehabilitation of class members, including, but not limited to institutional services, family care and support to the family, foster care, day care, respite care, crisis intervention, community residences, development centers, and work activity centers.

5. Defendants are enjoined from admitting any class member to Grafton state school unless it can be demonstrated that there is no less restrictive appropriate setting available to meet the needs of the individual.

6. Defendants are permanently enjoined to seek placement in existing licensed or accredited facilities, or to create community based residential services meeting ACMR/DD standards sufficient to reduce the number of residents at the Grafton

state school to not more than 450 by July 1, 1987, and to show the court reasonable progress to these ends annually. Further, the defendants are enjoined, by July 1, 1987 to present to the court a program to reduce the residents by at least an additional 200 persons before July 1, 1989.

7. Defendants are enjoined to employ persons to conduct a survey of the developmental level and needs of the residents remaining at Grafton state school and to determine the level, type, and location of additional services needed by September 1, 1983. The residential need surveys shall thereafter be reviewed at least annually.

8. Defendants are permanently enjoined to provide the necessary and proper inspection and response mechanisms to assure that all living arrangements and services of necessary quality and quantity are provided and maintained.

9. Defendants are permanently enjoined to comply with all Title XIX regulations by July 1, 1985, and to comply with all ACMR/DD standards by July 1, 1987, at all facilities where any class member is residing or will reside. Compliance includes personnel levels as well as facility standards.

10. Defendants are enjoined to prepare budgets necessary for compliance with this Order, and to seek all necessary authorization and appropriations to achieve full compliance within the prescribed time periods.

11. For the purpose of assuring that the relief ordered herein is properly implemented, the court herewith directs the parties to confer as expeditiously as possible for the purpose of filing with the court within ninety (90) days an agreed plan of implementation, detailing a timetable for the accomplishment of the objectives of this Order. In the event the parties are unable for any reason to reach agreement as to all aspects of the relief ordered, or fail to execute and complete an agreed plan of implementation, counsel are to file with the court the proposed plans of implementation. If necessary, the court will then issue a separate order.

12. The court shall appoint a monitor to monitor the implementation of this and any further orders of this court. The monitor will, inter alia, establish reporting requirements sufficient to fully inform the court of compliance to this and related orders. Conditions of appointment as outlined in the Order of December 11, 1981, pertain.

13. This court shall maintain continuing jurisdiction over this matter until the orders of this court are fully implemented.