ASSOCIATION FOR RETARDED CITIZENS OF NORTH DAKOTA; Lindley Black by his father, Sidney Black; Bradley Cossett, by his mother, Denise Cossett; Richard Schneiderhan, by his mother and guardian, Elmira Schneiderhan; Naomi Jordison; Timothy Jordison; Kelli Moriarty, by her mother and guardian, Jacquelyn Moriarty; Phillip Dechant, by his mother and guardian, Lois Dechant, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Edward T. SCHAFER, Governor of the State of North Dakota; Rod Backman, Facilities Management; Wanda Krotochzil, Superintendent of the Developmental Center at Grafton; Dr. Jon Rice, State Health Officer, Department of Health; Sam Ismir, Director, Division of Mental Health, Department of Human Services; Sandi Noble, Director, Division of Developmental Disabilities, Department of Human Services; Reuben Guenthner, Director, Department of Vocational Education; Wayne Sanstead, Superintendent of Public Instruction; Gary Gronberg, Director of Special Education Division, Department of Public Instruction; Henry Wessman, Director, Department of Human Services; Gene Hysjulien, Director, Division of Vocational Rehabilitation, Department of Human Services; Lori Wightman, Director, Office of Program and Policy Development, Department of Human Services, Defendants.

No. A1–80–141.

United States District Court,
D. North Dakota,
Southwestern Division.

Jan. 11, 1995.

Michael J. Williams, Fargo, ND, for plaintiffs.

M.K. Heitkamp, Atty. Gen. of N.D., Bismarck, ND, for defendants.

VAN SICKLE, District Judge.

An opinion and order of the United States Court of Appeals for the Eighth Circuit, dated August 14, 1991, *Association for Retarded Citizens v. Sinner*, 942 F.2d 1235 (8th Cir.1991), directed this court to consider the

merits of the claim of the State of North Dakota, pursuant to Fed.R.Civ.P. 60(b)(5), testing whether, if the injunction has become illegal or changed circumstances have caused it to operate unjustly, this court should modify or terminate the continuing permanent injunction. Relief is granted under 60(b)(5) in institutional reform litigation both because of the need to shape practical and flexible equitable remedies, and because principles of federalism and comity require that "a federal court's regulatory control . . . not extend beyond the time required to remedy the effects of past [Constitutional violations]," citing *Board of Educ. v. Dowell,* 498 U.S. 237, 243, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991).

■ The Circuit Court further observed that "by its Rule 60(b) motion, the State has placed in issue whether it is now in compliance with federal statutory and constitutional requirements so that this injunction must be dissolved and the case terminated." The Circuit Court further directed that "on remand, the District Court is directed to consider the merits of the State's claim that the State's compliance meets the standards of adequacy as defined in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 [104 S.Ct. 900, 910, 79 L.Ed.2d 67] (1984) and *Youngberg v. Romeo,* 457 U.S. 307 [102 S.Ct. 2452, 73 L.Ed.2d 28] (1982)." These cases had developed the principle that federal courts lack jurisdiction to enjoin state institutions and state officials on the basis of state law. *See Pennhurst,* 465 U.S. at 124–125, 104 S.Ct. at 920.

The Circuit Court did not, however, "otherwise limit the discretion of the district court to determine the manner in which it will proceed or the issues it will address." *Association for Retarded Citizens v. Sinner,* 942 F.2d 1235, 1241 (8th Cir.1991).

To the end that the North Dakota mentally disabled program should receive the most sensitive, objective, and thorough evaluation possible, this court appointed a panel of "masters" to hear the evidence and make recommendations to the court. The panel members chosen were two senior state legislators, one from each party; one person holding a Master's Degree and Professorship in nursing, who had observed the program as an assistant to the previously appointed monitor; an accountant and successful businessman, with unique sensitivity as to problems of disability; and a professor at the School of Law, University of North Dakota, as chairman of the panel. In addition to considering the exhibits, this panel heard the testimony of forty-four witnesses.

The evidence received by the masters vividly demonstrated the introduction of new and developing concepts in this area of social concern and service. When the case began, the policy of the State of North Dakota was to treat the mentally retarded and the developmentally disabled as non-persons, entitled only to protection from the elements and to food, until they died. The lawsuit arose out of the developing concept that all persons are entitled to seek self betterment and to live in the "least restrictive environment" that their difficulties could tolerate. "Least restrictive environment" was at first interpreted to mean the degree of separate life style a person's fully developed abilities could attain. Only after the first injunction was issued did the interpretation of "least restrictive environment" come to mean that the developmentally disabled person must be free, as the rest of us, to elect how separate, how independent, he or she wished to be.

The evidence also presented the little recognized fact that the Director of the Developmental Disabilities Section of the Department of Human Services, in addition to programming the application of federal and state moneys, must organize and direct, through case managers, the distribution of private charitable funds into the program, using them to develop the separate programs of the infinitely diverse people whom she is seeking to serve.

Because of extensive motion activity, problems of marshalling witnesses, scheduling the hearing of forty-four witnesses in twenty-nine trial days, and receipt of exhibits, the evidentiary hearings were not completed until August 7, 1993. Thereafter, counsel requested and received time in which to prepare their proposed findings and final arguments. The final arguments were concluded in December, 1993. The masters considered the case and presented their Report of the

Panel of Special Masters on November 14, 1994.

The report of the masters is so logically arranged, and so well developed that it is a model which should be made available to other groups who engage in this kind of evaluation. Therefore, the court adopts the report in its entirety and incorporates it into this order. The report follows:

## I. GENERAL BACKGROUND

The hearings conducted by this Panel of Special Masters appointed by the Honorable Bruce M. Van Sickle, Judge of the United States District Court for the District of North Dakota (the U.S. District Court), are a part of a longstanding piece of litigation which since 1980 has occupied not only the parties and the courts, but also the public and its elected representatives. As commenced, the action was almost exclusively about the campuses of the Grafton State School; that facility, now named the Developmental Center, was where the State of North Dakota housed its developmentally disabled citizens. After preliminary determinations and orders, including a 1980 class action certification, a November 4, 1981, Decree and Order was issued with the consent of all parties, including the State, which would substantially change the manner in which the Grafton State School was administered. It was decreed that Grafton State School residents have rights under the United States Constitution and State law to adequate treatment and care in the least restrictive practicable alternatives to hospitalization. It was ordered that resident care be individualized and that 125 additional personnel, in specified classifications, be hired.

The State's failure to perform its responsibilities under that Decree and Order produced a 1982 trial and a U.S. District Court opinion providing at length for the rights of the developmentally disabled, 561 F.Supp. 473, and, subsequently, a series of detailed orders implementing that opinion for the North Dakota population of persons with developmental disabilities. The 1982 opinion of the U.S. District Court was affirmed on the merits by the United States Court of Appeals for the Eighth Circuit on August 12, 1983.

713 F.2d 1384. In concluding that the U.S. District Court had not erred in allowing the case to proceed in federal court, and that neither had it erred in ordering the State to develop a program to administer State institutions and programs in very specific ways, the Eighth Circuit pointed out, 713 F.2d at 1392, that the U.S. District Court retained continuing jurisdiction to make accommodation for changes necessitated by circumstances. The U.S. District Court thereafter entered a detailed Implementation Order; in the years following that Order, the U.S. District Court has been presented with, and utilized, many opportunities to clarify it, amend it, enforce it, or specify its effect in particular circumstances.

## II. BACKGROUND SINCE 1990

Early in 1990, the U.S. District Court issued orders further implementing its 1982 decision. On March 19, 1990, it reaffirmed the 1982 injunction, and made changes in the manner of its implementation. Among those changes was the termination of the Office of the Court Monitor—a result the State had sought. The U.S. District Court's March, 1990 action shifted to a greater dependence on other mechanisms of enforcement assurance: independent expert accrediting organizations; and the State's own protection and advocacy agency, already in existence to meet the conditions for receipt of certain federal monies (see 42 U.S.C. § 6042).

Ultimately, the State requested relief from the March 19, 1990 Order's amendments of the overall regime; the mechanism the Eighth Circuit had noted in 1983 as being always available to the State was utilized to raise the point that the 1990 amendments to the enforcement mechanisms effecting the 1982 injunction were grounded in North Dakota law rather than federal law, and that the amendments were therefore beyond the power of the U.S. District Court under the United States Supreme Court's 1984 opinion in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67.

In 1991, the United States Court of Appeals for the Eighth Circuit ruled that the U.S. District Court was required to consider

the State's *Pennhurst* claim, and that the State's use of the "always available" mechanism, Rule 60(b) of the Federal Rules of Civil Procedure, was an appropriate procedural device to require that consideration. 942 F.2d 1235. The case was remanded for consideration of whether the State is now in compliance with federal constitutional and statutory requirements. The Court of Appeals said that the appropriate remedy was to dissolve the injunction and terminate the case if compliance was shown.

The Court of Appeals specifically continued in effect, during the compliance inquiry, the "mandates long in place and originally affirmed by this court," and refused to "limit the discretion of the district court to determine the manner in which it will proceed or the issues it will address." 942 F.2d at 1241.

■ Under Rule 60(b)(5), as the Court of Appeals noted, 942 F.2d at 1239, a district court's judgment may be lifted if it has been satisfied or its continued prospective application is no longer equitable; regarding injunctions, these inquiries include whether the injunction has become illegal (here, this could be the case by reason of *Pennhurst* if the sole basis for injunction were violation of state, as opposed to federal, law) and whether changed circumstances have caused the injunction to operate unjustly.

Injunctions in cases such as this one, "structural injunctions," are specially treated—coming as they do from "institutional reform litigation." The Court of Appeals noted the special treatment required, 942 F.2d at 1239, quoting a 1991 United States Supreme Court opinion. Since the Court of Appeals remanded, the Supreme Court has spoken further about undoing "structural injunctions" in "institutional reform litigation." *Rufo, et al. v. Inmates of the Suffolk County Jail et al.,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *Freeman, et al. v. Pitts, et al.,* 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

In *Freeman,* a school desegregation case, the Court recognized the district court's authority to return control to local officials for those aspects of the prior injunction for which compliance had been achieved. The Court also recognized that other parts of the injunction might need to remain in place to assure citizens their federal rights in areas where compliance had not been achieved.

*Rufo* was a jail conditions case in which the structural injunction (to build a new jail, thus to avoid double celling) had been entered upon the consent of the parties. The local authorities argued that modification of the injunction was appropriate for two reasons: first, the injunction had been issued prior to a Supreme Court pronouncement in a later case that double celling was not *per se* unconstitutional; and second, the number of persons placed in their care by the criminal justice system had already increased beyond the design capacity of the new jail, resulting in a continued need for double celling. Modification was refused by the district court. The Supreme Court, however, ordered the district court to employ a more flexible approach in the consideration of whether modification of the prior injunction was appropriate. Justice White's opinion for the Court noted that because decrees in institutional reform litigation are more frequent since the 1950s, and because they are often in place for extended periods (thus increasing the likelihood that there could be significant changes during the life of the decree), the ability of district courts to modify them has become more important. 502 U.S. at 379–80, 112 S.Ct. at 758. The Court held that modification under Rule 60(b)(5) of the terms of a decree relating to vindication of constitutional right may be granted where the party seeking it establishes a significant change in facts or law and the modification is appropriate to the changed circumstance. 502 U.S. at 383–84, 112 S.Ct. at 760. Justice White cited with approval, as an illustration, a case the United States Court of Appeals relied upon, at 942 F.2d at 1239–1240, in the present remand: "Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles, *New York State Assn. for Retarded Children, Inc. v. Carey,* 706 F.2d [956] at 969 (modification allowed where State could not find appropriate housing facilities for transfer patients); * * *." 502 U.S. at 384, 112 S.Ct. at 760.

While *Rufo* is a consent decree modification case, and the language in the opinion

constantly refers to consent decrees, the opinion is at bottom about nothing more than the power of a district court regarding judgments of all types. Rule 60(b) of the Federal Rules of Civil Procedure is the source of that power, and it is not limited to—in fact, it does not even expressly mention—consent decrees. Read in conjunction with *Freeman*, decided in the same term, *Rufo* signals clearly the power of district courts to treat structural orders in state institution reform cases as subject to a revisory process to provide continuing protection of federal rights while considering material changes of fact and law. Furthermore, according to the prior Memorandum and Order in this case reported at 561 F.Supp. 473, 475, the State recognized the basic rights of the plaintiffs in a "Decree and Order with consent of the parties" entered by the U.S. District Court on November 4, 1981.

## III. THE U.S. DISTRICT COURT'S APPROACH ON REMAND

Two directives constitute the U.S. District Court's substantive, direct response to the remand from the United States Court of Appeals for the Eighth Circuit. These are a Memorandum and Order entered April 29, 1992, and a Memorandum and Order entered May 21, 1992.

The first of these described as its task to "determine what rights plaintiffs had that were based on the United States Constitution or federal statutory law" [p. 2, April 29, 1992 Memorandum and Order], "to determine those areas, if any there be, where defendants have failed to meet those standards" [pp. 8 and 9, April 29, 1992 Memorandum and Order], "to conclude whether some form of permanent injunction should remain in place" [p. 8, April 29, 1992 Memorandum and Order], and "either to dismiss the action or to order appropriate relief" [p. 9, April 29, 1992 Memorandum and Order].

While these tasks arise from the 1991 remand from the Eighth Circuit, 942 F.2d 1235, it cannot be said that these questions came to the U.S. District Court for the first time by reason of any mandate from the Court of Appeals. The very U.S. District Court action which was appealed to the Eighth Circuit, which in turn produced the 1991 remand order, was nothing more than an attempt by the U.S. District Court to exit the case. As the March 19, 1990 Memorandum and Order said:

> During the course of administering its injunction in this action the court has been concerned throughout that the removal of the federal court from oversight of the administration of the ... [developmental disability] programs in the Department of Human Services must occur at the earliest possible moment. The entry of this court into the system was due to defendant's failure to meet the dictates of the United States Constitution regarding their responsibilities to the developmentally disabled citizens. * * *

> *    *    *    *    *    *

> If state government is going to remain viable it cannot fall back on the federal courts to perform those duties and services which properly belong to it. After more than nine years it is time for the state to take full responsibility. If it fails, the federal judiciary may have to step back in. If it succeeds, the federal judiciary must stay out.

The U.S. District Court then specified the process by which the State was to take full responsibility. It was the State's appeal of that process, and the judgment of the Court of Appeals that the process needed to be preceded by determinations on whether there were in fact still violations of federal law in the system, that brought about the 1991 remand.

The U.S. District Court's Memorandum and Order of April 29, 1992 identified the task on remand to be the determination of the plaintiffs' rights under the United States Constitution or federal statutory law. It determined what the rights were, ruling that plaintiffs have these rights as a matter of federal law:

1. The right to a free education and or appropriate training in the least restrictive setting.

2. The right to adequate housing, food, clothing and medical and dental care.

3. The right to have reasonable safe living conditions.

4. The right to avoid disclosure of personal matters, the right to have private personal space, the right to have personal property and a place to keep it and to account for and use it, the right of independence in making decisions, and the right of free association.

5. The right to be free from discrimination.

6. The right to be free from restraint.

7. The right to an individualized education plan which must be reviewed at least once a year.

[Omitted from the above restatement of the U.S. District Court's April 29, 1992 enumeration of plaintiffs' legal rights is the federal constitutional and statutory source given for each right described; those sources are detailed in the April 29 Memorandum and Order, and are summarized at page 8 thereof.] Having performed the first remanded task, the U.S. District Court promised that it would soon outline the procedure to be followed to accomplish task two: to determine whether the defendants were meeting the standards set out above.

The May 21, 1992 Memorandum and Order of the U.S. District Court contained the procedure to be followed. The court appointed five special masters under Rule 53, Federal Rules of Civil Procedure, and under its inherent power, to receive and evaluate evidence and expert opinions presented by the parties, and to report thereafter to the court on: (1) where, if at all, defendants are failing to meet the standards of care mandated by the federal rights identified in the Memorandum and Order of April 29, 1992; (2) if needed, what relief is required to correct the failure(s) to comply with the standards of care; and (3) how that relief will directly address and relate to those violations of federal law.

This document is the report of the panel under the U.S. District Court's May 21, 1991 Memorandum and Order. At that court's direction, appended to this report are resumes identifying each of the five panel members.

## IV. WHAT THE PANEL DID

The panel began to receive evidence on November 11, 1992. On several dates between then and the closing of the evidentiary record on August 7, 1993, the panel heard the testimony of, and received exhibits through, forty-four witnesses, four of whom (a plaintiff's expert, who had to testify in stages, and three persons who had been called by one side or the other in its case in chief but who were recalled by the State in its rebuttal case) came twice to the witness stand.

At least eleven of the forty-four were persons never formally associated with North Dakota's systems for delivery of services to the developmentally disabled and who had been brought to the State by a party to review service delivery for the purpose of reporting their findings and opinions as experts to the panel. Some of these eleven had been in the State before, as consultants or to offer programs, and/or had studied the North Dakota service delivery system—or even this litigation—for their own academic or research purposes. None had been involved in providing, or directing the provision of, services to members of the plaintiff class, on behalf of the State directly or through a contracted provider.

Beyond the eleven "outside" experts, two other persons were called as expert witnesses. One of these was the former director of North Dakota's developmental disabilities service delivery system, who had been out of the State and its system for several years, and was brought back by the State to speak to the present levels of service and the extent of the changes in services and delivery in the State since the start of this lawsuit. The other of these was a North Dakota resident, a neuroscientist, often contracted by the State or by parents or guardians for evaluations of school children's level of intellectual functioning, information essential to team development of an appropriate individualized educational plan. The same witness, an academic whose research program has involved the use of medications, including psychoactive drugs, in North Dakota and at developmental disabilities service

delivery sites, was also asked to testify regarding medication usage in the service delivery system in North Dakota.

Some of the thirty-one other witnesses, by reason of their position and responsibility, were required to be knowledgeable about the legal requirements for serving persons with developmental disability, and were permitted to testify whether those requirements were being met in those areas of the delivery system where they had knowledge and authority.

The panel did more than hear testimony and receive exhibits. Several important procedural, logistical, or preliminary matters had to be taken care of along the way, and are of sufficient importance to record here.

The defendant, the State of North Dakota, volunteered for the burden of proof. The State therefore presented its case in chief first.

Second, the question before the panel being whether any federal rights as defined by the U.S. District Court are being denied members of the class, a "time window" needed to be identified as the test period. The panel set the period from the United States Court of Appeals remand (August, 1991) to the start of its evidentiary proceedings (November, 1992) as the time being tested for system compliance. For the most part, the parties were permitted or required to prove the facts of the operation of services for persons with developmental disabilities only within that period.

Third, at the request of the State, granted by the panel through its chair for the purpose of lessening in some small way the complexity of these proceedings, the questions sent to the panel by the U.S. District Court were bifurcated for hearing. Testimony and evidence were taken first solely on compliance issues, and not permitted on remedy. The plaintiffs opposed and objected to the bifurcation. To date, the panel has heard testimony and received evidence only on phase one.

Fourth, class definition issues were raised with some frequency in the panel's work, usually when the plaintiff urged that a particular person was a class member and the defendant denied it. Twice, such questions arose in such important contexts that the panel was compelled to issue rulings by memorandum. These memoranda are dated October 21, 1992, and November 16, 1993, and have been filed with the U.S. District Court. They are, the panel assumes, part of the record in the case. In the first of them, "Ruling on Definition of Class," clarification of the class definition was required. Plaintiff requested records held by the State on individuals plaintiff asserted were class members. An express (June 25, 1992) order of the U.S. District Court granted plaintiffs access to those records if the individuals were within the plaintiff class. The defendants asserted that the records sought were not records of members of the class. The issue raised by the parties was whether mental retardation was an absolute prerequisite to class membership. The panel's memorandum explained its conclusion that, as the U.S. District Court had defined and administered the plaintiff class, mental retardation was not an absolute prerequisite to class membership. The second instance requiring a written ruling, "Ruling on class membership [status of certain individuals]," arose when plaintiffs, to demonstrate that some members of the plaintiff class were denied developmental disability services by the State, identified eight individuals who had been denied services and claimed that they were class members. Defendants denied that the eight individuals were class members. The panel's November 16, 1993 memorandum explained its determination that six of the eight individuals were class members and that two were not.

## V. THE FEDERAL RIGHTS OF PLAINTIFFS

In part III of this report, above, the panel listed the federally protected rights of members of the plaintiff class as declared by the U.S. District Court. In this part V of its report, the panel will, after preliminary remarks in subpart A, address the federally protected rights.

A. *The "trouble" with experts.* The panel has been told by the State's "outside" experts and witnesses that North Dakotans

with developmental disabilities are now served *at minimum* in a minimally adequate manner, all legal requirements met and all rights honored. The State's experts also told the panel that in very many aspects of the treatment and services required by federal law for those with developmental disabilities, class members are receiving substantially more and better service than the legal minimum. For some areas of service, at the locations for delivery seen by the experts, the testimony is that the quality and/or quantity of delivered services is at or among the best in the United States. This testimony was provided by people knowledgeable about their fields and their work, each credible within the range of their education and experience and within the limited extent of their actual examination of the service delivery system in North Dakota.

Not surprisingly, the plaintiffs' "outside" experts disagree. They too are people knowledgeable about their fields and their work, each credible within the range of their education and experience and within the limited extent of their actual examination of the service delivery system in North Dakota. In their view, taken together, at delivery service locations viewed by them, there are always points at which the services being delivered, in quantity and/or quality, fail to meet the minimum required by federal law.

Of course, it was relatively rare that experts for the State and the plaintiffs saw the same service being delivered to the same client at the same location, even at different times. At no time did each side's experts together see the same service being delivered to the same client at the same place.

Even if that had happened, thus enabling the panel to hear those experts display their expertise in the most helpful of contexts, the panel would not expect the experts to have agreed on the "bottom line" question of whether the federal mandate was being met. Each side's counsel would still support the proposition that its expert was the correct assessor for various reasons: the other's notes were incomplete, visit too brief, methodology flawed, experience less, education less prestigious, or preparation for the site visit insufficiently detailed or insufficient in

scope. Endless reasons were offered for discrediting the observations of an expert witness from a site visit: reviewing the Individualized Education Plans of all students in the unit first, as opposed to afterward or not at all; or talking, or not talking, to direct care staff; talking, or not talking, to classroom teachers, or special education directors, or parents, or team members, or assessors, or evaluators, or case managers, or the Qualified Mental Retardation Professional; or not looking at the actual habilitation plans of everyone at the site visited, or at the particular plan of a client interviewed there; or not interviewing any client there; or not reviewing all, or specific, work plans or training programs for clients at a day work activity; or not comparing a client's plans through time to note progress or lack thereof and whether the plan adjusts according to the circumstances; or not tracking quarterly utilization reviews of service plans.

This is not to say that the panel did not find the experts and their testimony interesting and useful. Indeed, each expert's contribution was valuable, limited only by the problem they all shared of small sample size and very limited exposure to each sample selected.

The panel is confident that these limitations did not materially affect the testimony and opinion offered. Each expert's conclusions would have been the same with unlimited time and a huge sample, only the costs of litigation would have been different. The panel's confidence derives not from any cynicism regarding the operation of the adversary system, but rather from what it learned from the experts themselves, as a group.

In a professional field, where professional judgment is both central and essential, and where that judgment is to be exercised over a wide range of discretion, agreement is not to be expected of the professionals. While it is easy to say "These are the requirements imposed by federal law and either the State is in compliance or it is not," such an attitude ignores that those requirements are not phrased as fixed points. The education services delivered must be "appropriate." Another service must be "adequate." Professional judgments differ on what is reason-

able, or necessary, or adequate, or appropriate in a given situation. This is recognized in all of the law regarding the delivery of services to those with developmental disabilities. All services are expected to be planned on an individualized basis by teams of professionals who are knowledgeable about the circumstance of the client for whom each particular service is to be provided. These teams are made up of individuals whose judgments will inevitably differ from the judgments of others who might have been on that team but were not, as well as from the judgments of others, experts who come behind them and review their work in progress or completed.

The fact that professional judgments by persons with discretion will nearly always differ, and that it is inherent in the federal laws regarding the rights of persons with developmental disabilities that what service is due them is a matter of professional judgment, is further complicated by the continual evolution, from one theory to another, of the basis on which professional opinion rests. There is professional opinion regarding the adequate, the reasonable, the minimum, the appropriate. And there is professional opinion about a level above that, presently referred to as "best practice." By professional definition, best practice requires more than the minimum, the merely adequate, or the merely appropriate. By agreement of the experts, best practice is not required by law, not even by federal law. But the evolution of professional opinion inevitably turns today's best practice into tomorrow's minimally adequate and appropriate level of service. This occurs through the relationship between academic research and thought, on the one side, and field practice and experience on the other. There is a constant upward pull as newer best practices are identified and what *used* to be the best practices are gradually adopted as the standard method or approach. At that point, the former best practices have become the minimum, the reasonable, the ingredients necessary to a professional judgment of adequacy or appropriateness.

This evolution is hardly being noticed here for the first time, and is not reported as evidence of the panel's insight. It is reported because the experts on each side helped the panel to see the particular application of this process to the specifics of the delivery of services to persons with developmental disabilities, which in turn allowed the panel to understand better the differences in opinion between the experts for the two sides.

The lack of agreement is about whether the standard has by now moved ahead to assimilate or adopt the earlier identified best practice. Differences and disagreements will be even more dramatic when what evolves is not merely a change in standards, but is what the experts describe as a paradigm shift, a major new conceptual model for the delivery of developmental disabilities services. In the area of services for persons with developmental disabilities, there has been at least one paradigm shift.

The most recent paradigm shift in judging the quality of services to persons with developmental disabilities is the move from consideration of process to consideration of outcome. It is uncertain whether the shift is complete or how much of it has been appropriated into a new standard of care. That the shift is well underway, however, and is in the late stages of full acceptance, is clear from the fact that the AC, the Accreditation Council (formerly the ACDD, Accreditation Council on Services for People with Developmental Disabilities), whose Director testified before the panel, has revised its set of standards to require review and evaluation of outcomes, not just a review of the process. For example, a review of the *process* of serving a class member might ask these questions: is there a team, does the team meet, is it properly composed, does it document its files, does it actually publish a plan, and is the plan reviewed at least annually? To meet the new AC standards, it will be necessary for inspectors to go beyond their checks on the process to see that teams have evaluated plans in terms of progress actually made by the client, and have adjusted plans according to the challenge of making better progress toward identified (and updated) goals.

While AC is a private organization, it is important to remember that because of the prior orders of the U.S. District Court in this case AC is an important quality assurance

mechanism for the protection of the rights of the developmentally disabled in North Dakota. The U.S. District Court also ordered that State and certain private provider facilities meet the standards imposed as a precondition to eligibility for certain federal programs under Title XIX.

Meeting Title XIX and AC standards has been the principal thrust of the U.S. District Court's orders designed to remedy the absence of, or gaps in, federally required services for the developmentally disabled in North Dakota. Educational services are federally regulated in detail under other provisions of law.

AC standards are continually moving to the new paradigm. Title XIX standards, applicable to all Intermediate Care Facilities for the Mentally Retarded (ICF/MR), are subject to a constant effort to keep pace with professional judgment regarding practices, and thus accommodate the shift as well.

The contrast between what it meant for clients to receive services from an accredited provider in the earlier years of the operation of the remedial program instituted by this litigation, and what it means now, and what it will mean tomorrow, marks movement which is all in favor of those with disabilities, and these improvements come without changes in the federal statutes or the constitutional provisions or the orders of the U.S. District Court. They come from the knowledge, new and applied, of the nation's leading professionals in developmental disabilities, as that knowledge is informed by actual delivery of services to, and otherwise dealing with, the client with those disabilities. Many of those leaders have been the parties' experts. It is not surprising that although they agree for the most part about the fact of the movement, they do not agree on its location at a given moment. Nor do they agree on the promise of its direction, or most importantly, for present purposes, how much of it has ceased being revolutionary or experimental and has become part of the standard. But this process has happened before, is happening now, and will continue to happen. As it happens, properly formed and operating teams will improve even further services to the developmentally disabled by meeting the demands of the evolution.

The State and the plaintiffs each took pride in presenting experts who, in other litigation in other courts, had been experts on the opposite side, or who in other districts had been court's experts or masters or resolution officers. Though these experts completely disagreed with one another as to the ultimate conclusions which must be made in these proceedings on remand, their disagreement has been instructive and helpful.

B. *Have the plaintiffs been lawfully treated and served as measured by federal authority?* The U.S. District Court's April 20, 1992 Memorandum and Order's federally protected rights listed above (part III) will be addressed here. As indicated above, however (part V.A), the record before the panel contains sufficient evidence to support either conclusion. The panel's judgment is based on its own interpretations of the meaning, relevance, and significance of all the evidence.

    1. "The right to a free education and or appropriate training in the least restrictive setting."

■ As the U.S. District Court put it in its April 29, 1992 Memorandum and Order, federal law requires that disabled children receive a free, appropriate education, tailored to the unique needs of the child by means of an Individualized Education Plan (IEP) which must be reviewed annually. To the maximum extent possible, disabled children must be mainstreamed into the regular educational process to receive education program benefits and services. The U.S. District Court ruled in its 1982 Memorandum and Order reported at 561 F.Supp. 473, at 492–493, that federal law requires the provision of special educational services. However, the law requires that "special" not be "separate," in the sense of segregated, except where the nature and severity of the handicap is such that the regular classroom, supplemented with aids and services, still will not benefit the child in the view of the professionals designing, advising, and implementing that child's IEP. Even then, segregation should only be employed pursuant to the individualized plan.

Regarding the right to a "free" and appropriate education, there is simply no class issue on cost. What is provided is free. Is it appropriate? It is appropriate if it is what a properly composed team has described in the plan. The panel finds that in North Dakota the Department of Public Instruction and the State's special education districts are operating to comply with federal regulations under the governing statutes and regulations.

The panel could find that, in individual cases involving class members, a student's assessment has not been completely documented, or that the individualized educational plan does not document all required contents, or that measures called for in an IEP are not being implemented each moment of the school day and in a regular classroom. However, it is important to note that the federal government's Department of Education, and the Office of Special Education Programs within it, requires the North Dakota Department of Public Instruction to inspect for compliance with the federal standards, has the power to withhold funds should it decide the State is not doing the job properly, and uses "look behind" inspections of its own to check the State's enforcement processes. Those mechanisms have all been employed in North Dakota.

The federal authorities have, to be sure, noted problems in individual cases in the several units and their many schools; but the response has not been to remove the funding from North Dakota's program. It has been to require plans of compliance to be submitted, which it has accepted.

Furthermore, the panel is impressed with the substantial system for problem resolution, through the team mechanism and the creation and review of the IEP, which the Department of Public Instruction oversees in accord with the mandate of federal law. The Department of Public Instruction, assisted by early identifier programs, provides parents very early on with clear information on education rights and the process of assessment and planning. This system is, in addition, buttressed by private action of groups such as Pathfinders, which assist the state in informing parents or guardians and, with those parents and guardians, are a powerful

force in making sure that federal rights important to a student and that student's parent(s) or guardian(s) are secured.

There are also formal legal processes available to those who complain of denials of their federal rights. These processes are only rarely activated. Given that the State and private organizations such as Pathfinders are continually making parents/guardians aware that those formal processes exist, the mere fact that those processes are seldom used indicates that educational services are available. The panel also finds that when formal and informal processes are employed to secure a right owed, but thought not to have been honored, those processes can be effective in resolving the problem.

As the U.S. District Court put it in its April 29, 1992 Memorandum and Order, the right to minimally adequate training exists only insofar as professional judgment determines that it is appropriate. The panel takes appropriate training to include aspects of habilitation and active treatment. The panel finds that these subjects are the focus of AC and Title XIX standards. Those standards, or at least the AC's standards, are designed to assure at least the minimum required by law, including federal law protective of those with developmental disabilities. Inspections are carried out to see whether the standards are being met, and a violation is cited, "tagged," as a point to be addressed.

The panel further finds that no service or provider should ever expect to escape an inspection "untagged." Many Title XIX inspections and AC inspections in North Dakota have produced multiple tags in all areas, including habilitation and training. Formal proceedings to revoke licensure or accreditation of a provider or facility have been extremely rare. From this, the panel concludes that, overall and statewide, the federal rights of class members to appropriate training, as a class, are secure.

The panel could find that there are delays in obtaining job slots to enable community placement, and that there are day work programs which, for lack of contracted work, involve idleness, and that the wait for adaptive equipment can be very long, and

that all of these problems have affected class members. The panel would also find, however, that the State and the providers of services are making an effort in seeking solutions in these instances. Further, the panel would find that these problems are addressed in the existing team's procedure for individualized planning of the goals, targets, skills, and behaviors of these class members, and that the team process is faithful and serious.

There are two particularly difficult and troubling problems in this area which plaintiffs have been most anxious to present regarding habilitation. They are: high direct care staff turnover and its effects on class members; and the movement of some class members on ISLA (Independent Supported Living Arrangement) contracts from an "habilitation" designation to a "care" designation.

The panel agrees that direct care staff turnover is problematic, but not that the North Dakota rates are especially high when viewed nationally. The panel agrees that turnover in direct care staff pressures staff training programs severely, because of large numbers of new people to train. The panel understands that clients are more comfortable with, and thus better served by, familiar persons—direct care staff with whom they are acquainted and who are acquainted with them and their plans (IHP, ISP, or IPP). The panel does not agree that turnover is purely a function of wage levels. The work is difficult and stressful and high burnout percentages can be expected under those circumstances.

Providers testified that they trained new direct care staff, and used State programs, facilities, and personnel to do so. New direct care staff must, of course, read and become familiar with the individualized plan(s) of every client they serve. Once a new direct care staff member has been fully trained, and has become familiar with clients' plans, there should be no difference in the training needs and performance of newer, as opposed to longstanding, direct care staff. There is not known to the panel to exist a federal right to direct care from a specific, identified member of the staff.

Regarding the change in classification of an ISLA contract from "habilitation" to "care," it suffices to say that while the impact on the provider who serves that client through that contract will be negatively affected by loss of the budget for the "Q" (the Qualified Mental Retardation Professional), it is not at all true that the client with the disability necessarily is affected. Some clients so re-classified have actually had their hours of service increased (which, in turn, increases the payment to the provider on that aspect of the contract above what it would have been without the hour increase). Most importantly, however, the panel was told by at least one provider that its services to the client did not change with the reclassification of the contract to "care." There was still a plan, which was to be implemented by the team. In fact, it appears that the reclassifications, in the relatively infrequent instances where they occur, are the result of quarterly and annual reviews of services and plans, the very processes which are supposed to identify necessary services. The most troubling aspect of these reclassifications is the assertion that they are not the result of team discussion and decision. There was testimony that teams had opposed reclassifications urged by the State's administrators of developmental disability services. However, there was also testimony that there were no "cramdowns." Teams considered and adopted reclassification even though they did not initiate it. In some instances, service hours to a client actually increased after the paperwork was revised. The panel concludes that although this reclassification may pose difficulties of administration and of budget for providers, client service does not change significantly. There is not inherent or apparent in that change any denial of a federal right of a class member.

The final question in this section is the matter of the least restrictive setting. The right to the least restrictive setting must be understood in a historical context. The term first came to be used in North Dakota when persons with developmental disabilities were warehoused. They were kept in overcrowded, oppressive living conditions with no services beyond the bare essentials to sustain

life. This was the circumstance in North Dakota at the Grafton State School and at the San Haven State Hospital. These "large congregate care facilities" offered little care, and certainly were not like home. The requirement to de-institutionalize, imposed by the U.S. District Court, was based on the recognition of the right to a less restrictive setting and to habilitation.

The U.S. District Court's 1982 Memorandum and Order, 561 F.Supp. 473, and its subsequent implementing orders, have all recognized that there would be some number of those persons with developmental disabilities who, because of the complexity of their needs and behaviors, would be congregated together. The 1982 Memorandum and Order in effect acknowledged that it would be impractical and inefficient to serve those clients individually in separate communities. The implementing orders following the 1982 decision always specified numbers of residents to be placed in communities, from the Developmental Center, by specific time deadlines. No implementing order ever required the Developmental Center to be emptied. The assumptions behind the 1982 Memorandum and Order remained in place.

History shows that the perspective on the use of the Developmental Center has continually evolved. In 1982 it must have also been the assumption that those who would remain congregated, the most involved persons, would have teams which would make decisions and write programs calling for those clients to remain at the centralized facility. Now, that assumption in some cases has been proven wrong. Although community placements from the Developmental Center have regularly exceeded the requirements of the U.S. District Court's orders in number and pace, it is now clear that many believe that an even larger number of such placements could be accomplished than had ever previously been contemplated. Although the resident population at the Developmental Center is below the maximum set by the U.S. District Court, a number of those still there have team decisions for community placement. Yet they are not in community placements. They remain at the Developmental Center. The plaintiffs claim that class members are not being served in the least restrictive setting as determined by their teams.

█ The problem is an apparent absence of necessary community facilities and services for those Developmental Center residents identified by their teams for community placement. However, for some of those clients, there would be no placement, even if there were facilities adequate to provide the necessary services in that person's community or near it. That is so because some Developmental Center residents, and/or their parent(s)/guardian(s), simply do not want a placement outside the perceived excellent facilities and services at the Developmental Center. They effectively block community placement by a refusal to approve the rest of the team's recommendation. The panel finds the State is wisely loathe to force a community placement on a client, family, or guardian that does not want it. The right to the least restrictive environment is as subject to waiver as any other (though careful independent review must be made available and the client and parent/guardian must be well informed and educated).

There is quite a difference between the number of class members residing at the Developmental Center argued by plaintiffs to have been team-identified for outplacement and the number of class members the State admits are Developmental Center residents notwithstanding a team recommendation favoring community placement. If the number is as the State admits, then—since the plaintiffs admit that the State is outplacing ten Developmental Center clients per year—there are no barriers and the team decisions favoring a less restrictive environment are in fact being implemented. The panel accepts the testimony of Dr. Meece in this regard. He testified that the plaintiffs' numbers were derived from Developmental Center documents studying outplacements on hypothetical bases, not actual team recommendations in specific class members' cases. He also testified that the Developmental Center's own general population targets were always subject to revision, as were its longer range planning targets determined by teams regarding the future of any particular class

member. Dr. Meece thought the difference between the State's figure for team decisions recommending outplacement and the plaintiffs' figure was mostly explained by plaintiffs' use of advance target dates, dates which became purely hypothetical when the team, in subsequent plan review, changed the target year to a later year.

Hence, the panel concludes that class members' rights to least restrictive environment are not currently being violated as to the residents at the Developmental Center.

    2. "The right to adequate housing, food, clothing and medical and dental care."

It can not be seriously contended that for the class as a whole, or that considering the State as a whole, there is any record of denial of adequate housing, food, and clothing. While the plaintiffs have shown some AC and Title XIX "tags" as to housing items, these are isolated matters and there is no suggestion that they were not ultimately remedied.

██ Matters are the same as to food in group homes. Food in ISLAs is, according to plaintiffs, a more severe problem, and there is evidence to support that. However, it is a problem which results from the involved class member's having been provided two other federal rights, one of which is itself the mechanism for solving the problem. The right to decisions about the individual being made for her or him by a team in which she or he participates, and in which parent(s)/guardian(s) meaningfully participate, which decisions include finding the least restrictive setting for residence, care, habilitation, or other service, has resulted in a team decision with client concurrence favoring an ISLA. Ironically, the fact that an ISLA is a very nonrestrictive residential arrangement, honoring the "least restrictive environment" mandate, leads to the reduced level of supervision which in turn increases the risk of poor diet. The same team decision-making process which created the increased risk for poor diet is also the mechanism to cure the problem. The teams might subsequently write into the clients' plans training and care programs sufficient to overcome the problem; or, if that is done but the measures fail, the team will have little choice but to return the client to a more restrictive setting. There is no guarantee that a team-made residential service decision favoring a less restrictive arrangement will be fail-safe, and if new problems arise the system will find them out and correct them.

The panel could find that there have been instances of improper diet, inattention to dietary restrictions or directions, and similar lapses. There is no evidence that these went unobserved and uncorrected. They are few in number and isolated in location and time. Some of these matters were documentation problems. The panel does not minimize these instances, but neither does it find that they constitute proof that the State operates or allows a system which deprives class members of their right to adequate diet.

The panel's views regarding clothing are the same. It could find isolated instances of improper clothing, but those would not bespeak a system in violation of the rights of the class.

The plaintiffs raise a separate point regarding food and clothing: that having to use food stamps to buy food and having to wear serviceable but not stylish clothing both stigmatize class members, making normalization into the community more difficult. The point is understood and appreciated by the panel, but it raises no issue unique to the plaintiff class. No court has the power to require non-parties to accept and socialize with anyone else; poverty is a circumstance not limited to the class. Class members have, according to the testimony, selected their own clothes (albeit from limited supplies available to them) in exercise of their liberty right to make basic personal decisions for themselves.

Medical and dental services are a more serious and complex matter. Plaintiffs admit that physician care such as annual exams and emergency care is ordinarily available. The complaint is apparently related to day to day follow-up by nursing services. AC and Title XIX inspection reports show tags for such instances and for medication supervision. It would not be possible for the panel to conclude that there have not been instances of inattention, or worse, in the medical care of

class members as noted by inspectors. Even if some of the tags merely reflect documentation problems, there will still be some tags which are inattention. In the medical services area this is a serious matter. However, in no small part due to the actions of the U.S. District Court, the State relies upon accredited status to police service delivery. The fact is that no providers or services have been marked for revocation of accreditation on grounds of denial of medical services. This is true notwithstanding that the record demonstrates that inspection results do not jeopardize accreditation status simply on the number of tags given.

■ The record clearly shows dental services have been a problem. There has been an inability of class members to access preventive or acute dental services in a timely fashion. The problems do not, however, relate to the State's failure to provide the services, but to the unwillingness of dentists and their practices to treat the class members in some areas of the State. To the State's credit, it recognized the seriousness of the situation and has taken action, in part during the "time window" being tested for compliance in these proceedings. It has amended medical assistance payment rates upward, as an incentive to dentists to provide the service, and it has enlisted the State Department of Health's assistance in dealing with dentists. Although the State was not able to show that the problem has been entirely resolved, progress is being made toward a satisfactory solution.

3. "The right to have reasonable safe living conditions."

The panel has dealt with the "adequate housing" issue at its most basic level. The plaintiffs' assertions regarding the violation of their rights by the State under this heading do indeed mark out some of the same territory. But under this heading there also arises the larger issue of the administration of the living arrangements.

■ The plaintiffs claim their rights to reasonably safe living conditions have been often violated in dramatic and specific ways, usually from inattention: required attention being absent, harm befalls the class member.

By definition, of course, these instances of inattention arise almost entirely within the residential setting, and are therefore subject to review by accreditation authorities. AC and Title XIX standards assure that quality living conditions are provided and the rights of class members protected. Still, there are some serious isolated incidents. The panel could find: that water temperature was uncontrolled, and was uncorrected even after notation; that a resident ate 60 Haldol tablets; that prescription medications for a class member went unadministered for three days; that class members have been left outside until frostbitten or dangerously unattended in a swimming pool; that a class member in an ISLA was essentially abandoned for a week notwithstanding that the contract called for regular staff checks; that a Developmental Center resident fell out a third floor window and was rendered quadriplegic when the staff should have known he would try to get out; that class members are not promptly cared for after urinating, defecating, or menstruating in their clothing, even though they were known to staff to be totally dependent and to have soiled themselves.

These incidents are not denied. They are explained, and they are cited as proof that the system finds its errors and takes care of them. Though there is no proof that the system managed to reverse a quadriplegia, the circumstances were attenuated—it should not have been possible for the victim to get out that window and it was reasonable for the State to conclude there was no risk that he could. Reasonable conclusions can be wrong, and this one was, tragically. It, and other instances mentioned, produce abuse and neglect proceedings, and remedial steps and lessons are learned to reduce the likelihood of future occurrences.

■ Twenty-four hour attendance by direct care staff personally present in the room (or outside) with the client for all clients would be neither possible nor lawful. For most, it would be a violation of the right to the least restrictive environment and the right to personal privacy and space. But it would be the only way to totally assure reasonably safe living conditions against the harms that can come about to the unattended

class members. The standard "reasonably safe" does not equal "totally safe." The State is not an insurer. It must decide reasonably, by team mechanisms, about the levels of attendance required, and then it must provide those levels; and it must maintain and support quality assurance mechanisms to catch its errors and to help prevent their repetition. Overall, the State has done this. To show that there have been injuries and lapses does not mean that it has not. Persons without disability, in their living conditions which are thought to be reasonably safe, have accidents, are injured. As to children, these things happen notwithstanding that there was someone with a duty to be attentive for their safety, yet it does not automatically follow that when harm befalls the child the one with the duty has breached it.

4. "The right to avoid disclosure of personal matters, the right to have private personal space, the right to have personal property and a place to keep it and to account for and use it, the right of independence in making decisions, and the right of free association."

The panel finds that the systems designed and operated for delivery of services available as a matter of right to persons with developmental disability in North Dakota to a large extent afford the members of the plaintiff class their personal liberties. Indeed, as noted elsewhere, affording "too much" freedom is often the cause of situations the plaintiffs complain about as violations of other rights. The State walks a tightrope, and perhaps it has "erred" occasionally in the direction of allowing, or facilitating, more freedom and liberty than was advisable, looking at the situation with the benefit of hindsight. At least the error was made in the name of securing to the class member one of her or his rights.

The reality of the need for attendance and care for many of the class members requires, in order to supply that attendance and care, small congregate care facilities, such as North Dakota's fully accredited/certified ICF/MRs. Assuming, as to those living there, that it is where the team believes the least restrictive environment for those clients

exists, the moderate degree of segregation implicit in the model is unavoidable, and can only be partially mitigated. The State recognizes and funds mitigation, and accreditation/certification inspectors review the operation of these facilities and programs against the standards protecting personal liberty. That the State can not satisfy critics of this effort is amply demonstrated by the proposition advanced for class members that ISLA placements can be isolating and denials of the freedom to associate. ISLA is arguably the least restrictive of all residential settings, less restrictive even than living under loving watchful eyes at home. This maximum deference to the right to be in the least restrictive environment with which the team concludes the class member can cope is cited as setting up a denial of rights of association.

A placement at the Developmental Center is criticized because family can not often come to Grafton for association. A home placement is criticized because it will, as operated, compromise the ability of the home based class member to associate freely with others *and* to participate in habilitative programs. These things can not both be so.

Direct care staff who, consistent with the client's plan, give the client privacy in his nakedness for showering or using the toilet, risk criticism when the client slips on dropped slippery soap in that shower or, in toileting, unknown to the staff has an "accident" that leaves his clothes soiled until noted or that leaves the bathroom in an unsanitary condition for another client's entry before staff should have discovered the problem. If these are wrongs, at least they are suffered for only the best of reasons.

5. "The right to be free from discrimination."

█ The panel sees the right to be free from discrimination as, basically, the right not to be segregated alone or with other class members on grounds of the disability. Some segregation is inevitable: class members whose teams properly determine that the least restrictive setting for them is the Developmental Center or an ICF/MR are thereby segregated with others similarly placed for residential services.

Two segregation circumstances most concern the panel: special education classrooms and day programs/workshops. The former have been discussed at V.B.1, above. The panel is content to let unnecessary class member segregation in the school be prevented by: the robust operation of the IEP process as regularly checked by the Department of Public Instruction and as buttressed by the federal Office of Special Education check-ups; the plans of compliance following inspections; the ever-more-informed and activist parents/guardians who are armed with clear delineations of their rights; the procedures to assure that those rights are respected; a plethora of remedies to employ when they are not respected; and active volunteer organizations, such as Pathfinders, which are both knowledgeable and willing to assist.

The matter of segregation in day activities is more difficult. Instances of segregation do exist in sheltered workshops, whose place in the paradigm is being phased out. There has been an effort on the State's part to reform the system. One Bismarck provider came to the State with an innovative plan to convert some segregated positions to integrated work settings, and was assisted.

In addition, the State's system seems to have high regard for the importance of normalization, which is the logical precondition to improved integration and reduced segregation. The supported employment program, the ultimate key to ending segregated day workshops, is hampered by a severe lack of a market in the private sector for employment. To the State's credit it has found ways to bolster extended services programs and to find integrated setting placements and to include individuals with severe disabilities. Even unlimited expansion of training for integrated setting supported employments and all the money in the world to fund job coaches would not increase the number of integrated private sector work settings if the private economy does not need employees or is otherwise not hiring. There is no evidence in this record that North Dakota's private employment market is discriminatory against the disabled, and in fact the panel believes the State's private employers to be especially willing to accept the employee with a developmental disability. But there are not many employers hiring regularly, and it is common knowledge that many persons leave the state for lack of employment opportunity. It can not be the answer that the State must create jobs for class members, for doing so would only create a publicly owned sheltered workshop.

Another segregation issue is the matter of class members residing in nursing homes and basic care facilities. Most of these placements are not segregating in the immediate sense, as all other residents in these facilities are not class members. Neither, however, as a population do they mirror the world of the fully abled, and therefore they do not represent great opportunity for normalization and genuine integration.

Nursing homes are residential settings, and class members living there are doing so either in conjunction with a team decision concluding that the placement is appropriate or wholly outside of the developmental disabilities system's processes. The federal Omnibus Budget Reconciliation Act (OBRA) requires special review, through the Pre–Admission Screening and Annual Resident Review (PASARR) process mandated in federal regulations. A person may not reside inappropriately (without need for nursing level care) in a nursing home. The State risks loss of federal funds if it permits inappropriate placements or continuations. North Dakota has not lost funds.

Case management services, including developmental disability case management and active treatment, are available for class members placed in nursing facilities. Nursing care is required or the individual could not be living in the nursing home. Therefore, class members properly residing in a nursing home probably require fewer habilitation and work activity services because their medical condition and medical service needs preempt other activities. Class members in nursing homes who at least arguably could do without nursing services could or should be placed elsewhere, but they and/or their families have rejected other placements. There are, therefore, sufficient safeguards against nursing home placements to prevent them from being used inappropriately or without

consent. Any segregation/discrimination resulting from the placement is necessary and deemed appropriate.

Basic care facilities are not similarly regulated as to resident need. There are class members in basic care facilities. Those facilities are regulated by the State, but not under OBRA and without any analog to the PASARR. The evidence is clear that the State provides case management services through the Developmental Disabilities Division to known class members residing in basic care facilities who want those services. The class members known to be in such facilities have affirmatively exercised their personal liberty rights of association and choice to remain there notwithstanding some concerted efforts by Developmental Disabilities administrators and case managers to move them to other residential options.

■ The availability of developmental disability case management to class members in basic care facilities assures those who do not exercise their right to refuse those services the proper team processes to build program or service plans. Such plans are the key to assuring delivery of services sufficient to protect class member rights.

6. "The right to be free from restraint."

The right to be free from restraint is part and parcel of the protection of the dignity of the individual, and of course is literally required to be honored if the individual is to be described as one who has liberty. With the other protections for dignity (privacy, space, possessions, association), the right to be free from restraint is what chiefly marks the modern era as distinctly different from the past.

It is therefore no surprise that the use of restraints is controlled in great detail. Special procedures must be followed to authorize use of restraints of any kind (chemical, bodily, isolation); special procedures are required when a restraint has been used; specific training in restraints is required of all staff; and a particularly thorough after-the-fact review is called for in the event of unauthorized restraint use.

The North Dakota system for serving persons with developmental disabilities incorporates these safeguards, but they are not always employed. Title XIX surveys and AC inspections have tagged deficiencies regarding restraint use. One example is absence of authorization in a behavior management program designed to develop control over the behavior "requiring" the restraint. Another example is insufficient after-the-fact review. Notwithstanding those tags, of course, facilities and providers continued on an accredited or certified basis.

Some of the deficiencies noted can properly be ascribed to mere errors of documentation, but in the area of restraints documentation is an especially important aspect of the regulatory scheme.

Testimony supported the conclusion that even where restraints were employed other than pursuant to an appropriately approved behavior management plan they were nonetheless, on the facts, appropriate. At the moment they were employed they were necessary. Even assuming that is true, the absence of appropriate after-the-fact review within the system renders the conclusion unverifiable. After-the-fact review is only accomplished at the local provider level, and, where an incident exists, through Protection and Advocacy review. Only an internal system review by the Department of Human Services seems lacking. Witnesses testified that physical restraints known by them to have been employed were, in fact, employed only under appropriate circumstances in their professional judgment. Testimony revealed that frequency of physical restraint across the system in North Dakota is relatively low.

■ There was ample testimony that chemical restraints were employed outside of any authorization in an individual's behavior management program; such authorization is not, in fact, a requirement as to prescription pharmaceuticals. It was uncontradicted that all drugs administered were, other than administration errors which would not be instances of restraint attempts, drugs prescribed for that class member by one having authority to prescribe drugs by law. Failure of staff to administer a prescribed drug

would, of course, become the basis of a complaint for denial of medical services/treatment and, if it caused harm, of a professional negligence claim. It is difficult to see how the administration in good faith of prescribed drugs as directed, even those which operate in fact as a restraint, can constitute a violation of rights or a wrongful act.

7. "The right to an individualized education plan which must be reviewed at least once a year ..."

The panel's discussion at V.B.1 above, regarding education in the least restrictive setting, of necessity dealt with the existence of individualized planning. Only an Individualized Education Plan (IEP) determined by professionals exercising their judgment as to an appropriate placement can be considered least restrictive. Such placement may or may not call for activity outside of the regular classroom. The panel has already found, therefore, that members of the class have IEPs, and now further finds that they are annually reviewed. Although there are questions raised about the planning and about the appropriateness of a specific plan, these plans are the product of professional judgment exercised in the ordinary course and are subject to well known and regularized processes of parental involvement and mature systems of dispute resolution. The State's Department of Public Instruction Division of Special Education has been very active in leading the way toward assuring that North Dakota's Special Education Districts understand and implement the program for the benefit of all those intended to benefit, including the members of the plaintiff class. One North Dakota school has been recognized nationally for the exemplary manner in which it has implemented the federal statutes and regulations.

## VI. FURTHER CONSIDERATIONS

The panel has had the benefit of a broad and detailed review of developmental disability service programs in North Dakota. Not content to allow counsel for the parties to be the exclusive producers of the record, panelists rarely failed to ask a witness questions. These proceedings were anything but a passive exercise. This report of the panel does not adequately reflect the scrutiny the panel has focused on the treatment of the class of plaintiffs by the State.

Some of the panel's concerns are evident in the above (part V.B.) summaries of the panel's views regarding the areas of federal right identified by the U.S. District Court. Others will be set out below. First, however, the panel must state its recognition of the fact that to some its conclusions will seem to be callous toward those for whom all persons must be both sensitive and protective. The panel has indeed minimized serious incidents or problems in aspects of its conclusions formed on the basis of its review. These minimizations are not born of any lack of respect for persons affected, and the panel obviously is without any power to undo effects of others' acts, defaults, or errors.

Any review, including the panel's, of the present North Dakota systems for delivery of services to persons with developmental disabilities must of necessity be conducted in the shadow of how those systems were constructed when this litigation was begun. It is instructive to read the U.S. District Court's August 31, 1982 Memorandum and Order as one considers the system today; the panel has never had the picture painted in 1982 out of its mind. People who need not have been institutionalized at all were confined in a facility which was inadequate to the task; it was, for ease of cleaning, finished in much of its interior with ceramic tile— easy to hose down, but cold and unable to soften the din of high noise levels. It was overcrowded. The State spent fewer dollars per day on each confined person than any other state—by far; the national average was $77.99 spent per resident per day, and North Dakota spent $26.42 per resident per day. The facility did not qualify for federal funds under Title XIX of the Social Security Act. Only 6% of the public residential facilities nationally did not qualify. The facility was critically understaffed. There was little or no adaptive equipment or even regular issue support equipment. Habilitation planning was a new endeavor not especially well executed and implemented. Medication usage, administration, and evaluation of actions and side effects were haphazard. Meals

were poorly served; "time-out rooms" were many, abused, and unmonitored. There was no centralized record gathering, and records that were kept were incomplete. Conditions of confinement and understaffing produced widespread self-stimulation and a high incidence of abuse between residents.

The above does not represent the State's facility as it occasionally was or was at its worst, but what it was every day all day for those confined. The U.S. District Court held that picture up against the law and found it severely deficient, violative of the rights of the citizens there confined, and did what it had to do.

The picture of the present system in North Dakota, a continuum of facilities and services from the Developmental Center to family support, the formalization of education and training through wholly individualized professionally developed plans, is exactly what the U.S. District Court envisioned and described in its 1982 opinion published at 561 F.Supp. 473. The State and all of its facilities and services have qualified for and received, and continue to receive, the available federal dollars allocated by the Congress to the task. Facilities and services of a type for which accreditation is available have attained and maintained that status. That which was seen as necessary, in the sense of a system which could do the job properly for those persons with developmental disabilities, has been accomplished. The system was built. As the state of the art has developed, the State of North Dakota has adapted. In 1982, in the context of the huge institution at Grafton, what looked ideal was community group homes. Now, community group homes are thought too large, too segregated, too restricting for many, and the movement is toward independent supported living or family-based services. North Dakota's system has responded; the group home census has been reduced, ISLA contracts have been increased. The system has shown an ability to adapt.

In the space of twelve hard years, North Dakota has moved from an embarrassing lack of appropriate attention to its responsibilities to become a forward-looking provider of the most promising methods and mecha-

nisms to benefit those whom it once ignored. To deny that recognition is to ignore volumes of fact and countless days, months, and years of work, not to mention expense.

Are things perfect? No, and they never will be. Are there mistakes made in individual cases or occasional circumstances? Of course there are, and there always will be. Will imperfections and mistakes threaten the federal rights of persons with developmental disabilities? Yes, they have and they will. But the difference between today and 1982 is that the system can now recognize its errors, make adjustments, and minimize the likelihood of repetition. The accreditation and certification processes facilitate the State's performance of that function. The federally required protection and advocacy effort is also intended to facilitate that performance.

Earlier in its report, the panel quoted from a March 19, 1990 Memorandum and Order entered by the U.S. District Court. By way of highlighting concerns it has above and beyond those already noted in part V.B., above, the panel once again refers to other language in the March 19, 1990 pronouncement:

> Based upon ... [information submitted by] the parties ... and the court's own observation of the programs, the court has concluded that the inadequacies of the ... programs for the developmentally disabled persons lie not in the nature or structure of the programs themselves, but in the administration and delivery of services. The programs are in place but are not always administered so that those who are entitled to services get them. * * *

The panel believes that overall delivery of services has improved sufficiently since those words were written but believes that concerns regarding central administration of the developmental disabilities service program will inevitably continue. If the system is to profit from its momentum and build upon it, it must pay more attention to professional judgment and information available to it. For instance, it would seem elemental that all Accreditation Council reports should be compiled as they come in, with running tabulations of accumulated system tags, so as to identify system weaknesses where the De-

partment would do well to focus added attention. System weaknesses commonly include inadequate training and failure to communicate to regional directors overall problem areas pointed out by statewide and other data cumulations.

The situation is the same with the Title XIX reports, the Department's own utilization reviews, and the mysterious (as to its intended useful purpose) annual BOCK instrument. Further information should be obtained and studied for system planning and improvement. This does not happen either.

The Department and Division should manage, not just "broker" services and referee the system. The service delivery system would benefit from regular "bottom up" reviews of what is going on, what is difficult, and where the crunch points are.

One might wonder where the Protection and Advocacy Project is in all of this. The panel is unsure. The State cites P & A as a major part of quality assurance. But the principal activity of P & A seems to the panel to be reactive, and its role as independent investigator and judge in abuse, neglect, and exploitation matters appears to leave it considered by all other parts of the service delivery system to be such an adversary that mutual projects for system improvement are not possible due to a vacuum of mutual trust.

The Protection and Advocacy Project could be an oversight mechanism to help improve the system. A close reading of its statutory mission reveals that they include oversight for *system* correction. Since that is not happening, it probably needs to be attended to. System oversight could be given a higher priority by the Project. The Project's governance probably needs to be more responsive to all affected parties. Improved responsiveness might be accomplished through greater attention to the operation of the Project's governing committee. It could function as a true Board of Directors, setting policy for the Project's director and other administrators. It should perform its complete mission as the governing board of an independent entity.

When the United States Court of Appeals for the Eighth Circuit published its opinion remanding this case to the U.S. District Court, the act which in turn gave this panel this task to perform, the Eighth Circuit said:

\* \* \* [T]he State has offered affidavit evidence that the San Haven institution has been closed; overpopulation at the Grafton facility has been alleviated; the State's funding of programs for the mentally retarded has dramatically increased; the State now qualifies for Title XIX federal funding; the use of physical restraints and medication are carefully supervised by professionals; client abuse is strictly prohibited—in short, that all systemic constitutional violations that may have existed at the start of this litigation have been eliminated. Although appellees have contested some of these assertions, our review of the record suggests that the State has presented a prima facie case of current compliance, particularly under the changed legal environment of *Youngberg* and *Pennhurst.*

942 F.2d 1235, at 1240 (8th Cir.1991).

The panel has now seen the State produce more than mere offers of affidavits as to the assertions attributed to it above. The panel has, in its review of the record, studied plaintiffs' assertions of federal rights violations. The panel has found that the examples presented appear to be relatively isolated, unconnected incidents involving oversight, common errors in judgment, and service inconsistencies between regions. No willful or knowing acts of abuse, neglect, or deprivation of rights of class members have been left unaddressed. The State has demonstrated that its system for delivering services to persons with developmental disability no longer has inherent within it violations of the federal constitutional and legal rights of those so disabled.

Although the State has been trying for years to get this lawsuit dismissed, it may find that dealing with one class action is preferable to defending numerous individual actions. Although the plaintiffs have for years feared the dismissal of their lawsuit, they may find that the State can more readily adapt the system to changing paradigms without the overarching structure imposed by a twelve year old court order.

The panel respectfully requests to be discharged.

/s/ <u>John S. Dalrymple</u>
John S. Dalrymple III

/s/ <u>Tish Kelly</u>
Tish Kelly

/s/ <u>Mickey Knutson</u>
Mickey Knutson

/s/ <u>Randy H. Lee</u>
Randy H. Lee

/s/ <u>Darrel H. Vollmers</u>
Darrel H. Vollmers

John S. Dalrymple III

Post Office Box 220

Casselton, North Dakota 58012

(701) 347-4291

## PERSONAL

- Born October 16, 1948
- Resides with wife, Elizabeth, and four daughters ages 9, 11, 17, and 19 on their family farm near Casselton, North Dakota
- Manages the Dalrymple Farms, established in 1875 as North Dakota's first large scale wheat farm

## EDUCATION

- Graduated Cum Laude from St. Paul's School in 1966
- Graduated with Honors from Yale University in 1970 with a BA in American Studies

## AGRICULTURE

- Named by the U.S. Junior Chamber of Commerce as the Outstanding Young Farmer in the United States in 1983
- Received the "Leading Agriculturist" award from Concordia College
- President, 1990-1991, North Dakota State University President's Agriculture Club

## BUSINESS

- Chairman of the Board, Dakota Growers Pasta Company, a $40 million integrated durum wheat mill and pasta plant at Carrington, ND operated as a farmers' cooperative by over 1000 members
- Director, Golden Growers Corn Cooperative, representing approximately 2500 corn producers investing in a new corn wet milling plant to be located in the Dakotas
- Steering Committee member, Walton Bean Growers Cooperative
- Past Director, First State Bank of Casselton and First Bank Fargo

## LEGISLATIVE

- Served five terms in the North Dakota House of Representatives including the following:
  - Human Services, Judiciary, and Industry, Business and Labor Committees
  - Vice Chairman, Human Services Section of the Appropriations Committee (1989 Session)
  - Chairman, Human Services Section of the Appropriations Committee (1991 Session)
  - Chairman, Full House Appropriations Committee (1993 Session)
  - Member, North Dakota Emergency Commission
  - Runnerup, 1988 Republican Endorsement contest for the U.S. Senate
  - Republican Endorsee; 1992 U.S. Senate Election (lost to Kent Conrad)

## PUBLIC SERVICE

- Co-Founder and Past Chairman of Share House Inc., a residential treatment program for recovering alcoholics and drug dependents in Fargo
- Former Chairman of the Board of Prairie Public Television
- Chairman of the Management Committee, Fargo Dome Authority
- Director, Casselton Jobs Development Commission
- Trustee, North Dakota State University Development Foundation
- Former Director, Cass Rural Water Users Association

## AWARDS AND HONORS

—Named "Legislator of the Year" by the ND Shooting Sports Association for work on firearms legislation

—Given the "Guardian" Award by the National Federation of Independent Business for work on tort reform

June, 1994

Senator Tish Kelly
404 South University

Fargo, North Dakota 58103

(701) 232–6929

The 1993 Legislative Session represents 10th term in office. First elected to the North Dakota House of Representatives in 1974. Elected to North Dakota Senate in 1990.

Served as Speaker of the North Dakota House of Representatives from 1982–84.

Legislative Committees:

| | |
|---|---|
| 1979–1991 | Member of the North Dakota Legislative Council |
| 1977, 1985–present | Member of the Budget Section |
| 1983–present | Member of the Legislative Management Committee |

Appropriations Committee (currently a member)
Finance & Taxation Committee (2 terms)
Industry, Business & Labor Committee (1 term)
Political Subdivisions Committee (4 terms)

Legislative Interim Committees:

| | |
|---|---|
| 1979–80 | Chair, Social Services |
| 1981–82 | Vice Chair, Budget B, Medical School |
| 1983–84 | Chair, Elections Committee |
| 1985–86 | Chair, Education |
| 1987–88 | Chair, Budget Committee on Human Services |
| 1989–90 | Chair, Budget Committee on Human Services |
| 1990–92 | Chair, Western ND Budget Tour |
| 1990–92 | Chair, Legislative Management Committee |
| 1993–94 | Chair, Finance & Tax Committee |

National:

| | |
|---|---|
| 1980 | Delegate to the Democratic National Convention |
| 1984 | Delegate to Democratic National Convention |
| 1984 | Co–Chair, ND Mondale–Ferraro Campaign Committee |
| 1985–86 | Member of the National Democratic Policy Commission |
| 1992 | Co–Chair, ND Clinton–Gore Campaign Committee |
| 1983–85 | Board Member of the National Legislative Leaders Foundation |
| 1985–86 | Chair, Arts, Tourism & Cultural Resources Committee, National Conference of State Legislatures |
| 1992 | Chair, Midwest Council of State Government's Committee on Canadian Relations |

State:

| | |
|---|---|
| 1975–87 | Member of the Judicial Planning Commission |
| 1975–present | Member of the Executive Board of District 21–Dem–NPL |
| 1979–1981 | Member of the ND Developmental Disabilities Council |
| 1987–1992 | Member of the ND Bicentennial Commission |
| 1985–present | Member of the Agassiz Women's Political Caucus |
| 1986–1992 | Member of the Advisory Board to the ND State Hospital |
| 1986–87 | State Coordinator—Report on State Outdoor Recreation |
| 1987–present | Member of the Capitol Arts Commission |
| 1986–present | Fargo–West Fargo Democratic Women Plus |
| 1989–present | Member of the Advisory Committee Robert Wood Johnson Grant Project—St. Luke's Hospital, Fargo, ND |

| | |
|---|---|
| 1991–1993 | Member of the North Dakota Film Commission |
| 1992 | Member of "Growing ND" Review Committee |
| 1992–present | Member of ND Municipal Bond Bank Advisory Board |
| 1992–present | Member of Federal Review Panel on the Association of Retarded Citizens lawsuit |
| 1993–present | Member of the ND Medical School Advisory Board |
| 1993–present | ND State Trails Task Force |

Education:

| | |
|---|---|
| 1950–51 | University of Kansas |
| 1951–52 | University of Alabama |
| 1952–54 | University of Maryland Graduate—B.A. in History and Political Science; member of Phi Alpha Theta, National History Honorary Society |

Jobs Held:

| | |
|---|---|
| 1954–56 | National Security Agency |
| 1957–59 | Staff—Senator Wayne Morse |
| 1959–61 | Staff—Congressman Jeffrey Cohelan |

Family:

Husband, John—Attorney
Three sons—David, Peter and Daniel

---

## CURRICULUM VITAE

Name: Mickey Knutson, RN, MN

Present Position:

*Co–Director,* University of North Dakota, Physician Assistant Program, Grand Forks, ND (1982—present)

*Associate Professor,* Department of Community Medicine and Rural Health, University of North Dakota School of Medicine, Grand Forks, ND (1982—present)

*Director,* Division of Health Practitioners, Department of Community Medicine and Rural Health, University of North Dakota School of Medicine, Grand Forks, ND (1977—present)

*Special Master Panel Member,* U.S. District Court—Association of Retarded Citizens versus the State of North Dakota (1992—present)

Education:

1958—Bachelor of Science in Nursing, University of North Dakota, Grand Forks, ND

1961—Masters in Nursing, University of Washington, Seattle, WA

1978—Family Nurse Practitioner/Physician Assistant Certificate University of North Dakota, Family Nurse Practitioner/Physician Assistant Program Grand Forks, ND

Professional Experience:

*Monitor's Team Member,* Federal Court concerning compliance to Federal Court Order, Association of Retarded Citizens versus the State of North Dakota (1981—1990)

*Educational Specialist,* University of Hawaii School of Medicine Health Manpower Development Staff International Contract, 1979–1983

*Project Coordinator,* Experimental FNP/MD Joint Practice Project, Department of Community Medicine and Rural Health, UND School of Medicine, Grand Forks, ND (1977—1982)

*Director,* University of North Dakota FNP/PA Program, Department of Community Medicine and Rural Health, UND School of Medicine, Grand Forks, ND (1972—1977)

*Assistant Professor of Nursing,* Minot State College, Minot, ND (1971—1972)

*Director,* St. Francis School of Nursing, Minot, ND (1966—1971)

*Assistant Professor of Nursing,* University of North Dakota College of Nursing, Grand Forks, ND (1963—1966)

Memberships:

Association of Physician Assistant Programs

American Academy of Physician Assistants

North Dakota Academy of Physician Assistants

Association of Teachers of Preventive Medicine Curriculum Advisory Committee

Mountain Plains Regional AIDS Education and Training Center Representative

Numerous other national, regional, state and local committees.

Consultantships:

American Medical Association Site Visitor for Accreditation of Educational Programs for Assistant to the Primary Care Physician (1981—present)

North Dakota Board of Medical Examiners regarding rules and regulations for physician assistants (1989—present)

Rural Health Development Project AID/MEDEX, Lesotho, Africa (1981)

Presentations (Most Recent):

Speaker, "Role of a Physician Assistant in Providing Health Care to Rural Communities", Community Forum, Walhalla, ND, 1994

Moderator, "Non Physician Provider Utilization", Dakota Conference on Rural and Public Health, Fargo, ND 1994

Speaker, "Utilization of PAs in Rural Communities" Community Forum, Cooperstown, ND 1993

"Effective Use of FNPs and PAs in Rural Settings", Dakota Rural Health Conference, Fargo, ND (1990)

"Issue's in PA Education", Panel Member, AAPA North Central Regional Meeting, Madison, WI (1990)

Publications:

Knutson, Mickey, RN, MN; "Why Would a Physician Want to Incorporate the Physician Assistant Role Into the Practice Setting?" *UND Family Practice Quarterly;* Grand Forks, ND; March, 1994 pp. 38–40.

Knutson, Mickey, RN, MN; "The Role of Rural Independent Providers in the Provision of Rural Health Care", *National Institute for Rural Health Policy, Conference Proceedings, Availability and access to Health Care for Rural America;* Des Moines, IA pp. 100–101, 1988

Eelkema, Robert C., MD, MPH and Mickey Knutson, RN, MN; *Basic Principles for New Role Development: A Ten Year Experience;* The Journal of Long–Term Care Administration; American College of Health Care Administrators, Vol. II, No. 3, Fall 1983, pp. 10–14.

Task force on Family Nurse Practitioner Curriculum and Evaluation, *Guidelines for Family Nurse Practitioner Curriculum Planning,* University of New Mexico Duplication Facility, Albuquerque, NM 1978, 1980

Knutson, Mickey, RN, MN, "How to Develop Effective MD/NP Teams" *New Approaches to Counseling and Communication: How to Improve Your Skills in Patient Care,* Seattle: MCSA, 1977, pp. 60–64.

Honor Societies and Awards:

Sigma Theta Tau National Honor Society

UND President's Award for Outstanding Service, 1990

Distinguished Service Award by the North Dakota Academy of Physician Assistants, presented 1991

(as of Fall, 1994)

RANDY H. LEE
2507 Clover Drive
Grand Forks, North Dakota 58201–7463
(701) 775–0268

Professor, School of Law, University of North Dakota

*Office Address:* Room 205, Law Building
University of North Dakota
Post Office Box 9003
Grand Forks, North Dakota 58202–9003

*Office Phone:* (701)777–2226

*Telecopier:* (701)777–2217

*Teaching Assignments:* **Agency & Partner-ship; Conflict of Laws; Corporations;** Labor Law; **Professional Responsibility;** Workers' Compensation. [**bold** = annual-ly]

*Research:* Professional Responsibility, Bar Admissions, Legal Education, Limited Partnerships; author and updater, NORTH DAKOTA PRACTICE GUIDE, in *STATE LIMITED PARTNERSHIP LAWS,* Prentice Hall Law & Business, Inc.; 53 MD.L.REV. 577 at 606; 56 N.D.L.REV. 325.

*Service:* Chair, Audit Committee, Law School Admission Council; American Bar Association Standing Committee on Pro-fessional Discipline; American Bar Associ-ation Coordinating Committee on Legal Education; Joint Committee [of the North Dakota Supreme Court and the State Bar Association of North Dakota] on Attorney Standards (Supreme Court appointee); Federal Practice Committee, District of North Dakota; Attorney Standards Com-mittee, State Bar Association of North Da-kota; UND President's University Plan-ning Council; North Dakota University System Council of College Faculties, elect-ed UND representative.

EDUCATION: McDonogh School, McDo-nogh, Maryland, graduated 1962. Bache-lor of Arts, Washington and Lee Universi-ty, Lexington, Virginia, 1966.

Juris Doctor, *summa cum laude,* Washing-ton and Lee University, Lexington, Virgi-nia, 1969.

PROFESSIONAL LICENSURE: Mary-land, since 1969. North Dakota, since 1980. Various federal courts, including U.S. Supreme Court since 1974.

EMPLOYMENT: Member of the faculty, School of Law, University of North Dakota, since 1975 [Acting Dean, 1979–1980. Ten-ured approximately 1980. Professor since 1985]. General Counsel, Maryland Port Ad-ministration, 1973–1975. Assistant Attorney General of Maryland, 1972–1975. Associate at the firm of Semmes, Bowen & Semmes, Baltimore, Maryland, 1969–1972.

PERSONAL: Born in Baltimore, Maryland, November 27, 1944. Married to Paula J. Himmelheber, of Baltimore, in Baltimore on December 17, 1971. Public Radio volunteer, KFJM, Grand Forks: program producer, en-gineer, and on air host—weekly program "In the Mood."

Darrel H. Vollmers
351 Telstar Drive
Bismarck, ND 58501

| | |
|---|---|
| 1983–Present | Controller/Treasurer/stockholder<br>Stan Puklich Chevrolet Inc. (Since 1983)<br>Budget Rent–A–Car (Since 1987)<br>Bis-man Sea Ray Boats (Since 1989)<br>Bismarck, N.D. |
| 1973–1983 | Ass't. Director—Fiscal Affairs<br>Director of Institutions<br>State Capitol Bldg.<br>Bismarck, ND |
| 1967–1973 | Director—Utility Assessments<br>North Dakota Tax Department<br>State Capitol Bldg.<br>Bismarck, ND |
| 1965–1967 | District Supervisor/Field Audit<br>North Dakota Tax Department<br>Grand Forks, ND |
| 1963–1965 | Field Auditor<br>North Dakota Tax Department<br>Grand Forks, ND |

A collateral matter, which this Court has held in suspension, is the matter of outstanding attorney fees and costs claimed by the Plaintiffs. The United States Supreme Court has spoken to this point in *Texas Teachers Assn. v. Garland School District,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), where the Supreme Court held:

> If the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind.... Thus, at a minimum, to be considered a prevailing party ... the plaintiff must be able to point to a resolution of the dispute which changes the relationship between itself and the defendant. *Id.,* at 791–92, 109 S.Ct. at 1493.

Another case factually akin to our problem is *Rogers v. Okin,* 821 F.2d 22 (1st Cir.1987). In that case, the First Circuit held that the fact that mental patients failed to recover damages did not preclude finding that they were "prevailing parties," entitled to recover attorney fees in a civil rights action wherein patients achieved success on significant injunctive issues. *Id.,* at 23. In this case, of course, the plaintiffs achieved complete success for their cause.

In conformance with the Report of the Panel of Special Masters,

IT IS ORDERED:

1. That the panel members are dismissed and relieved of further duties.

2. That the permanent injunction is terminated and dismissed, its purpose having been realized.

3. That within fifteen days of the filing of this Order Plaintiffs shall present:

   a: Their outstanding attorney fees, and separately

   b: Their outstanding statutory costs, which, when finally determined, are allowed.

4. That within fifteen days of the filing of plaintiffs outstanding attorney fees and statutory costs, defendants shall present their objections, if any.